UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, WISCONSIN, the Commonwealth of MASSACHUSETTS, VIRGINIA, and the DISTRICT OF COLUMBIA *ex rel.*, SMSF, LLC, | § § § § § § § § § § § § § § § | Civil Action No. _l 6 CV 11379_ |
| Plaintiffs, | § § | |
| v. | § § | |
| BIOGEN, INC., INVENTIV HEALTH, INC. and ASHFIELD HEALTHCARE, | § § § § | |
| Defendants. | § § § | |



## COMPLAINT OF THE UNITED STATES

### FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730

The United States of America (the "United States") and the Plaintiff States (defined below) (the United States and Plaintiff States are collectively referred to herein as the "Government"), by and through their *qui tam* Relator, SMSF, LLC (the "Relator "), bring this action under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA") and the false claims acts of the respective Plaintiff States against defendants Biogen, Inc. ("Biogen" or the "Company"), inVentiv Health, Inc. ("inVentiv") and Ashfield Healthcare LLC ("Ashfield") (inVentiv and Ashfield are collectively referred herein as "Vendor Defendants"; Biogen, inVentiv, and Ashfield are collectively referred herein as "Defendants") to recover all damages, penalties, and other remedies provided by the False Claims Act, and analogous state statutes,[1] and for their complaint ("Complaint") allege:

---

[1]     Specific citations for relevant state *qui tam* statutes are as follows: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois False Claims Act, 740 ILCS 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; Iowa False Claims Law, I.C.A. § 685.1 *et seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*; Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*; Montana False Claims Act, MCA § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*; New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*; New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*; Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*; Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws c. 12 § 5(A) *et seq.*; Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; and District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

1.     Based on the Relator's personal knowledge and further investigation, sufficient evidence exists to allege that Defendants have violated and continue to violate the False Claims Act, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute" or "AKS"), and the false claims acts of the respective Plaintiff States, by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks paid in violation of the AKS.

2.     This case is wide-ranging, but Defendants' scheme is straightforward at its core. Defendants concocted and executed a plan to induce providers to write prescriptions for its drugs by engaging in a "white coat" marketing scheme by using clinical educators ("CE") as de facto sales representatives for Biogen's multiple sclerosis ("MS") medications and devices, providing doctors willing to write prescriptions for Biogen products with the services of free CEs for their practices, and providing free reimbursement support ("RS") services to prescribing providers.

## PARTIES

3.     Relator is SMSF, LLC, a Delaware limited liability corporation formed to investigate and prosecute this matter.

4.     Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. ("Medicare").

5.     The Plaintiff States are the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, Wisconsin, the

3

Commonwealths of Massachusetts and Virginia, and the District of Columbia. They each bring claims for Defendants' violations of their respective state false claims acts, as set forth in detail in the Counts, below.

6.     Biogen is an international pharmaceutical company with its headquarters in Cambridge, MA.

7.     Biogen markets and sells pharmaceuticals throughout the United States and around the world, including Avonex and Plegridy, two interferon-class drugs used to in the treatment of multiple sclerosis ("MS").[2]  Avonex's (interferon beta-1a) sales have been robust, topping one billion dollars annually the last several years.  In 2013, for example, Biogen's U.S. sales of Avonex totaled $1.2 billion, $564 million—nearly half—of which came from Medicare Part D reimbursements.  In 2015, Plegridy's first full year on the U.S. market, the drug reached sales of $227.1 million in the U.S. alone.

8.     Biogen also markets and sells Tysabri (natalizumab), a humanized monoclonal antibody used to treat symptoms of MS, among other things.  Biogen's U.S. sales of Tysabri totaled $1.4B in 2013, over $15 million of which came from Medicare Part D reimbursements.

9.     Avonex, Plegridy and Tysabri are referred to herein collectively as the "Covered Drugs."

10.     The Covered Drugs compete in a huge and lucrative marketplace.  According to a report compiled by data analytics firm GlobalData, the value of the MS therapeutics national market currently exceeds $17 billion, and will exceed $20 billion by 2024.  As such, most of the major pharmaceutical companies, including Biogen, have one or more drugs each competing

---

[2]     For simplicity, Avonex and its prefilled pen form, Avenox Pen, are discussed and referred to collectively as "Avonex."

against one another for market share. A large part of the Covered Drugs' success can be attributed to Defendants' unlawful conduct as detailed herein.

11.     InVentiv is an international company headquartered in Burlington, MA. Ashfield is an international company headquartered in Ivyland, PA. Both inVentiv and Ashfield provide commercial outsourcing services to pharmaceutical companies, including "market access" services, among which are the services of CEs. CEs are credentialed healthcare providers such as licensed practical nurses and registered nurses who complement the work of the traditional sales representatives, purportedly to improve patient outcomes through education and other services. Since 2013, Ashfield has contracted to provide Biogen with CEs for the same purpose. Prior to that, inVentiv contracted with Biogen to provide Biogen with CEs to support its marketing of the Covered Drugs.

## JURISDICTION AND VENUE

12.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

13.     The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq.*, and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

14.     Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the District of Massachusetts, as well as a statement of all material evidence and information currently in its possession and of which it is the original source. These disclosure statements are supported by material evidence known to the Relator at the time of filing establishing the existence of

5

Defendants' false claims.  Because the statements include attorney-client communications and

work product of Relator's attorneys, and will be submitted to those Federal officials in their

capacity as potential co-counsel in the litigation, Relator understands these disclosures to be

confidential and exempt from disclosure under the Freedom of Information Act.  5 U.S.C. § 552;

31 U.S.C. § 3729(c).

## **BACKGROUND**

### *The False Claims Act*

15.     The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent
> claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or
> statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F),
> or (G);

> (D) has possession, custody, or control of property or money used, or to be
> used, by the Government and knowingly delivers, or causes to be delivered,
> less than all of that money or property;

> (E) is authorized to make or deliver a document certifying receipt of
> property used, or to be used, by the Government and, intending to defraud
> the Government, makes or delivers the receipt without completely knowing
> that the information on the receipt is true;

> (F) knowingly buys, or receives as a pledge of an obligation or debt, public
> property from an officer or employee of the Government, or a member of
> the Armed Forces, who lawfully may not sell or pledge property; or

> (G) knowingly makes, uses, or causes to be made or used, a false record or
> statement material to an obligation to pay or transmit money or property to
> the Government, or knowingly conceals or knowingly and improperly
> avoids or decreases an obligation to pay or transmit money or property to

the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

16.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

### The Anti-Kickback Statute

17.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A) and (B), prohibits offering to pay or paying any remuneration (including any kickback, bribe, or rebate) to any person to induce such person "to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program" or "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." *Id.* Pursuant to the Anti-Kickback Statute, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare and Medicaid. In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Statute and other federal laws

governing the provision of health care services in the United States.

18.     For purposes of the AKS, "remuneration" includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly.  Importantly, the statute has been interpreted to cover *any arrangement where one purpose of the remuneration is to obtain money for referral of services or to induce further referrals. United States v. Kats*, 871 F. 2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F. 2d 68 (3rd Cir. 1985), cert. denied, 476 U.S. 988 (1985).

19.     A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(b).

20.     Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA.  42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the FCA]. . . ."); *see also United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 315 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA.").

21.     The Anti-Kickback Statute was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA.  42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that

violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

22.     Compliance with the Anti-Kickback Statute is a condition of payment under federal health care programs. Therefore, any violation of the Anti-Kickback Statute is a violation of the False Claims Act because claims seeking payment for services or prescriptions tainted by kickbacks are either "factually false" or "legally false," and therefore do not meet the conditions of payment from federal health care programs.

23.     Defendants violated the AKS in several ways.  First, Biogen illegally paid the Vendor Defendants to induce providers to prescribe Biogen's products and devices.  Second, Biogen and the Vendor Defendants violated the AKS by providing CEs and valuable services to providers in exchange for, and with the intent of inducing, millions of dollars' worth of prescriptions for Biogen's drugs and devices.

24.     Regarding the first aspect of Defendants' fraud, pursuant to a contractual relationship between the Defendants, Biogen implemented a marketing scheme directed at potential prescribers of MS products sold by Biogen.  For purposes of the AKS, two fundamental questions must be addressed regarding Biogen and the Vendor Defendants' relationship:

1) Is there remuneration between parties?

2) If so, is any part of the remuneration to induce referrals and/or for making recommendations for items paid for by Federal healthcare programs?

25.     Here, the Vendor Defendants and Biogen had a contractual arrangement whereby Biogen paid (*i.e.*, remunerated) the Vendor Defendants for its services.  Therefore, for purposes of analyzing the marketing scheme under the AKS, the element of remuneration is established.

26.     Just as indisputable is whether "*any*" part of the Vendor Defendants' contractual

remuneration from Biogen was to "induce" either "referrals" and/or make "recommendations," thus implicating the Anti-Kickback Statute and subjecting Defendants marketing scheme to scrutiny. Pursuant to that contract, as discussed in more detail below, the Vendor Defendants hired and deployed expert clinicians to market, promote and recommend the Covered Drugs. Although these clinician educators were all employees of the Vendor Defendants, they were all trained and directed by Biogen's marketing management team to promote and recommend the Covered Drugs.

27.     As is detailed below, Biogen's primary purposes in contracting and paying the Vendor Defendants to give free educational services to providers – regardless of whether Biogen had any intent to cause that service to educate patients or physicians – was to induce those physicians to prescribe Biogen's MS medications. This necessarily violates the AKS.

> Relevant to this matter is the use of independent sales agents by pharmaceutical manufacturers. For years, OIG has been suspicious of utilizing "independent" sales agents for government reimbursed he Sales agents are in the business of recommending or arranging for the purchase of the items or services they offer for sale on behalf of their principals, typically manufacturers, or other sellers (collectively, "Sellers"). Accordingly, any compensation arrangement between a Seller and an independent sales agent for the purpose of selling health care items or services that are directly or indirectly reimbursable by a Federal health care program potentially implicates the anti-kickback statute, irrespective of the methodology used to compensate the agent. Moreover, because such agents are independent contractors, they are less accountable to the Seller than an employee. See 56 Fed. Reg. 35952, 35981 (July 29, 1991); 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989).

OIG Advisory Opinion 98-10 (Aug. 31, 1998).

28.     And OIG is especially wary of arrangements with independent sales agents that involve "white coat" marketing. White coat marketing is where medical suppliers use medical professionals to promote its products. OIG's concern is that patients may not be able to differentiate between the professional's medical advice and their promotion of medical products. Specifically, OIG has stated:

> The fraud and abuse risks are compounded where, as here, a physician or other health care professional is involved in the marketing activity—a practice sometimes referred to as "white coat" marketing. White coat marketing is closely scrutinized under the anti-kickback statute because physicians and other health care professionals are in an exceptional position of public trust and thus may exert undue influence when recommending health care-related items or services—especially when marketing to their patients. *See, e.g.*, 56 Fed. Reg. 35952, 35974 (July 29, 1991). Given the nature of these relationships, when physicians or other health care professionals market items and services to their patients, patients may have difficulty distinguishing between professional medical advice and a commercial sales pitch.

OIG Advisory Opinion 11-08 (June 14, 2011).

29.     In this case, Defendants have used and are using CEs – medical professionals – to promote its products to physicians and patients.  And Biogen does this under the guise of providing physician practices and patients with "education."

30.     OIG has, in several advisory opinions, provided a non-exhaustive list of six suspect characteristics of arrangements among sellers, sales agents, and purchasers that appear to be associated with an increased potential for program abuse.  They are as follows:

(1)     Compensation based on percentage of sale;

(2)     Direct billing of federal health care program by the seller for the item or service sold by the sales agent;

(3)     Direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a federal health care program;

(4)     Direct contact between the sales agent and federal health care program beneficiaries;

(5)     Use of sales agents who are healthcare professionals who are persons in a similar position to exert undue influence on purchasers or patients; or

(6)     Marketing items or services that are separately reimbursable by a federal healthcare program (*e.g.*, items or services not bundled with other items or services exclusively by a DRG payment), whether on the basis of charges or costs.

OIG Advisory Opinion 98-10 (Aug. 31, 1998).

31.     In discussing these factors, OIG, in Advisory Opinion 98-10, specifically stated "[t]he more factors that are present, the greater the scrutiny we ordinarily would give an

arrangement." OIG has continued to cite these same six illustrative factors in analyzing arrangements between providers and independent sales agents. *See* OIG Advisory Opinion 99-3 (Mar. 16, 1999).

32.     In this matter, the conduct of Biogen's independent sales agents (*i.e.*, the Vendor Defendants' CEs) met each of the suspect characteristics above:

1)  The Vendor Defendants' employee incentive compensation and performance, evaluations was directly linked to the sales volume created by the CEs recommendation of the Covered Drugs, including new patient starts (*i.e.*, new patient prescriptions).

2)  The Covered Drugs were billed to federal health care programs;

3)  The Vendor Defendants' CEs were in direct contact with hundreds of thousands of physicians and staff in a position to prescribe Biogen's products, which were reimbursed by federal healthcare programs;

4)  The Vendor Defendants' expert clinicians were in direct contact with patients who were federal health care program beneficiaries;

5)  The Vendor Defendants' expert clinicians were healthcare professionals able to, and who did in fact, exert undue influence on purchasers or patients; and

6)  The Covered Drugs are separately reimbursable by a federal healthcare program.

33.     Beyond the foregoing, Defendants have unlawfully given prescribers unlawful inducements to prescribe Biogen's drugs to patients. These inducements were provided by both Biogen and the Vendor Defendants. The remuneration had a specific purpose. Biogen knew that if it could create unique economic "value proposition" to potential prescribing providers, it could not only gain better access to them but, more importantly, could secure prescriptions. Thus, unlike the direct *quid pro quo* cash for prescriptions, sham speaker programs and other well-known kickback schemes, Defendants offered to and did in fact provide free MS education, trained office staff and patients, and provided physicians' patients with an expert clinician to answer questions and provide advice (*i.e.,* in kind remuneration) in order to induce referrals from physicians to whom this free expertise was provided. As shown, below, this conduct violates the AKS.

34.   As already noted, above, the Covered Drugs are very expensive. Given as much, prescription drug plans, including Government plans such as Medicare and Medicaid, are simply not willing to automatically cover such drugs merely because a physician believes it is appropriate for a given patient. As a result, in order for the Covered Drugs to be covered by insurers, providers must undertake a lengthy and expensive process to "prove" to insurers that the drug is needed for their patient and should be covered. This process can take up to 90 minutes per prescription, a substantial commitment of time and resources for a provider, who will not be reimbursed for his/her time or the time of his/her staff. As an alternative, equally distasteful and unreimbursed, providers may elect to outsource the pre-approval process to a third party, which typically costs a provider $50-$80 per prescription. Capitalizing on this conundrum facing providers, companies like Biogen have created programs that subsidize providers' costs of obtaining coverage to induce providers to write more prescriptions for their drugs.

35.   Here, Biogen developed and staffed a concierge of free services that it marketed along with Biogen's drugs in order to induce prescribers to prescribe its drugs. That is, in exchange for prescribing its drugs, Biogen would assume providers' administrative costs associated with getting patients approved for therapy utilizing its drugs. The primary incentive that these programs offer are reimbursement support services. RS services resulted in greater savings to the practice, and therefore profit, as the time and money spent on reimbursement issues would fall on Biogen. In this way, Biogen's reimbursement services induced providers to prescribe Biogen's costly products over cheaper alternatives. The value of the RS services Biogen was providing prescribers was approximately worth $50-$80 for each prescription written for the Covered Drugs. As a result, every prescription written by providers participating in Biogen's RS program was tainted by a violation of the Anti-Kickback Statute and, thus, any such claim submitted for reimbursement to

the Government was necessarily rendered false within the meaning of the False Claims Act.

36.     As a result of Biogen's misconduct, the Government paid these false claims and suffered substantial losses.

## SUBSTANTIVE ALLEGATIONS

### I.     Overview of Medicare and Its Benefits

37.     Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

38.     Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled. 42 U.S.C. § 1395w-101 et seq.  All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. HHS, through its component agency, CMS, contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage. Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

39.     Medicare Part D requires all participants in the program – prescription drug plan ("PDP") sponsors, Pharmacy Benefit Managers ("PBM"), and pharmacies – to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1).  Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(3)(v).

40.     The federal government's target is to pay 74.5% of the actual costs of basic prescription drug coverage (as defined at 42 U.S.C. § 1395w-1029(a)(3)).  42 U.S.C. § 1395w-115(a). Rather than a straight reimbursement, however, the government uses economic incentives and disincentives to encourage both beneficiaries and Part D Plan sponsors to reduce costs.  42

U.S.C. § 1395w-115.

41.   For beneficiaries, the disincentives for running-up high drug expenditures include requiring them to pay certain amounts out-of-pocket (in the aggregate referred to as a beneficiary's True Out-Of-Pocket ("TrOOP")). Those sums include:

    a) a beneficiary premium equal to 25.5% of the national weighted average plan bid, as adjusted (approximately $350), 42 U.S.C. § 1395w-113(a);

    b) a deductible defined as 100% of the first $250, as adjusted (although 90% of Part D Plans eliminate the deductible and use a tiered co-pay), 42 U.S.C. § 1395w-102(b)(1);

    c) thereafter a 25% copay on all costs up to the coverage gap, 42 U.S.C. § 1395w-102(b)(2);

    d) 100% of costs between $2,250 and $3,600, as adjusted, 42 U.S.C. § 1395w-102(b)(3) & (4) (the "coverage gap" or "donut hole"); and

    e) whereafter, the beneficiary enters the catastrophic coverage phase and only pays a copay of 5%, or $2 for a generic drug and $5 for any other drug. 42 U.S.C. § 1395w-102(b)(4)(A)(i).

42.   Because beneficiaries are required to pay a significant copay, and 100% of the cost of drugs while they are in the deductible and coverage gap phases of the program, Medicare Part D provides certain protections to beneficiaries. For example, sponsors must make the negotiated prices available to beneficiaries regardless of what "phase" of the Part D benefit an enrollee is in (*i.e.* deductible, ordinary coverage, coverage gap or catastrophic coverage). In addition, that negotiated price must also remain uniform within a particular pharmacy regardless of what phase of the program the beneficiary is in. Prescription Drug Benefit Manual, Ch. 5 "Benefits and Beneficiary Protections," § 20.6 ("the negotiated price for a particular covered Part D drug purchased at a particular pharmacy must always be the same regardless of what phase of the Part D benefit an enrollee is in").

43.   Another beneficiary protection is that, while they are in the deductible or coverage

gap phases where they pay 100% of the costs, beneficiaries may avail themselves of a cash price that is better than their PDP's negotiated price if the pharmacy is offering a "'special' price or other discount for all customers, or if the beneficiary is using a discount card." Prescription Drug Benefit Manual, Ch. 14 "Coordination of Benefits," at 50.4.2.  If the beneficiary makes such a purchase outside of their plan, their expenditure will still count toward their TrOOP if they report it to their plan. *Id.*

44.     For Part D plan sponsors, the program is a quasi-free market model that uses a variety of incentives which are part of the structure of the program.  The starting point is that the program only pays the sponsor "interim payments . . . based on the Secretary's best estimate of amounts that will be payable after obtaining all of the information." 42 U.S.C. § 1395w-115(d)(1). In other words, Medicare Part D is not a capitated federal insurance program, but rather an actual cost program.  *Id.*; *see* 42 U.S.C. § 1395w-112(g) (prohibiting states from imposing premium taxes on Part D subsidy since, unlike Part C, the payments are not capitated premiums); *compare to* 42 U.S.C. § 1395w-114(c)(2) (expressly authorizing capitated payment only for those Part D beneficiaries in the lowest income tier who qualify for greater subsidy).

45.     In simplest terms, the sponsor submits a bid based on actuarial data estimating the actual cost of providing prescription drugs to its pool of beneficiaries.  The government then makes "interim payments" to the sponsor on a monthly basis.  As an express condition of receiving those interim payments, the sponsor is required to submit to the government truthful and complete data, including actual cost, for every prescription filled.  At the end of each year the government then compares its interim payments to the actual cost data, and determines whether the sponsor owes a refund to the government, or whether the government is required to pay more money in order to meet its subsidy target.  In order to further incentivize the sponsor to keep costs down, however,

the refund or additional payment is first subject to risk corridors which penalize the sponsor if actual costs exceed its bid, and reward the sponsor if actual costs are below its bid. 42 U.S.C. § 1395w-115(e). As a practical matter, these risk corridors would only slightly increase or decrease the total percentage paid by the government for each prescription.

## II.   Overview of Medicaid and Its Benefits

46.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

47.     The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." See 42. U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

48.     The Medicaid programs of all states reimburse for prescription drugs. The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the

amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. § 430.30.

### III.    The TRICARE Program

49.    TRICARE is a managed health care program established by the United States Department of Defense. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by the Defendants.

### IV.    The United States Food, Drug, and Cosmetic Act

50.    The FDA regulates the manufacture, sale, and distribution of drugs and devices in the United States under the authority of the United States Food, Drug and Cosmetic Act ("FDCA"). The FDCA establishes the framework for regulation of, inter alia, the sales and marketing activities of pharmaceutical manufacturers in the United States.   This authority includes oversight of promotional labeling and advertising for prescription drugs and restricted devices. 21 U.S.C. § 502.

51.    The FDCA defines "label" to mean "a display of written, printed, or graphic matter upon the immediate container of any article . . . ." 21 U.S.C. § 321(k). "Labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).  For a prescription drug or

device to comply with the FDCA's requirement of adequate directions for use, its labeling must contain, among other things, information addressing product hazards and other risk information, as specified in FDA regulations. 21 C.F.R. §§ 201.100(d)(1) & (3) and 801.109(d).

52.     The FDCA also subjects advertising for prescription drugs and restricted devices to the disclosure of risk and other informational requirements. Advertisements for prescription drugs must include, among other things, "information in brief summary relating to side effects, contraindications, and effectiveness," as specified in FDA regulations. 21 U.S.C. § 352(n). Advertisements for restricted devices must include "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications . . . ." 21 U.S.C. § 352(r). Both prescription drug and restricted device advertisements also must not be false or misleading. 21 U.S.C. § 352(q)(1) & 321(n); 21 C.F.R. § 202.1(e)(5).

53.     Disease awareness communications are communications disseminated to consumers or health care practitioners that discuss a particular disease or health condition, but do not mention any specific drug or device or make any representation or suggestion concerning a particular drug or device. FDA Guidance for Industry (draft guidance), *"Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms* (January 2004).[3] Help-seeking communications are disease awareness communications directed at consumers. *Id.*

54.     Help seeking and disease awareness communications constitutes neither labeling nor advertising. *Id.* Therefore, help seeking and disease awareness communications are not subject to the disclosure of risk information and other requirements for labeling and advertisement

---

[3]     On May 6, 2015, the FDA announced that it was withdrawing the draft guidance. *See* 80 Fed. Reg. 26059. Thus, pharmaceutical manufacturers can now rely on two previously released industry policy guidance releases: Clarification of Policy on Institutional, Corporate, or Health Message Advertising (September 1985) and Institutional/Disease-oriented Advertisements (June 3, 1988).

communications under the FDCA. *Id.*

55.     The FDA will treat as a disease awareness communications any communications by or on behalf of a manufacturer, distributor, or retailer of a drug or device that:

    i.     discuss a disease or health condition;

    ii.     if consumer-directed, advise the audience to "see your doctor" for possible diagnosis and/or treatment;

    iii.     if aimed at health care practitioners, encourage awareness of signs of the particular disease or health condition, or otherwise provide information to assist in the diagnosis of the particular disease or health condition;

    iv.     do not mention a particular drug or device; and

    v.     do not include any representation or suggestion relating to a particular drug or device.

*Id.*

56.     When a disease awareness communication is presented in a combination with a product promotion communication, in a way that causes the audience to perceive the two pieces as an advertisement or promotional labeling piece, a disease awareness communication may be treated by the FDA as labeling or advertising. *Id.* For example, a purported disease awareness communication disseminated by or on behalf of a drug manufacturer can be subject to the FDA's labeling or advertising requirements if it mentions a specific drug or contains a representation or suggestion concerning a specific drug or device. *Id.*

57.     In determining whether a disease awareness communication and promotional communication were disseminated in such a way as to trigger the FDA's advertising or labeling requirements, the FDA focuses on how the audience is likely to perceive the communication. Specifically, the FDA has stated that:

a supposed disease awareness communication could be properly treated as advertising or promotional labeling if presented in combination with a product

claim advertisement or promotional labeling piece in a manner that causes the pieces' messages to be linked together by the audience. In such a case, the combined communication would also communicate a particular product's indication and efficacy for a certain medical condition. If the combined communication does not comply with the act and FDA's advertising or labeling regulations, the communication would cause the promoted product to be misbranded.

*Id. See also* Enforcement Letter From FDA's Division of Drug Marketing, Advertising, and Communications to Schering Corp. (Aug. 18, 2000) (finding that two advertisements, a help seeking advertisement and a reminder advertisement, which immediately followed each other in a magazine, converted the entire presentation into one full product advertisement, subject to the FDA's regulations)[4]; FDA Guidance for Industry, *Distributing Scientific and Medical Publications on Unapproved New Uses – Recommended Practices* (February 2014) (Stating that scientific or medical journal articles and reference texts and clinical practice guidelines ("CPG") provided by pharmaceutical manufacturers to health care professionals should be distributed "separately from the delivery of information that is promotional in nature. For example, if a sales representative delivers a CPG to a physician in his or her office, the CPG should not be attached to any promotional material the sales representative uses or delivers during the office visit. To the extent that the recipients of the CPG have questions, the sales representative should refer the questions to a medical/scientific officer or department, *and the officer or department to which the referral is made should be independent of the sales and/or marketing departments*.") (emphasis added).

58.    Moreover, the FDA has identified two factors which it examines when determining

---

[4]    This letter is available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Enforcement ActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM 166052.pdf.

whether two communications together qualify as promotional labeling or advertising. The two factors are: (1) Are the pieces perceptually distinct in use of graphic, visual, thematic, or other presentation elements?; and (2) Are the pieces presented in close physical or temporal proximity?

*Id.*

59.     Of these two factors, the FDA considers the determinant factor to be whether the pieces are perceptually distinct.   In addressing this factor, the FDA recommended that manufacturers:

> ensure that their disease awareness communications and reminder promotional pieces or product claim promotional pieces are sufficiently distinctive in terms of their thematic, graphic, visual and other presentation elements so that they will not be perceived as a single promotional piece that includes both a product name and a use, and is thus subject to the requirements for "labeling" or "advertising" mandated by the act and regulations.

*Id.*

60.     Here, Defendants violated the FDA's for rules for labeling, advertising, and sales representative communications by simultaneously providing purported disease awareness communications and drug-specific promotional communications. This is due to, and evidenced by, in large part, the close collaboration between CEs and Biogen sales representatives.

61.     For example, in their oral communications with physicians and their staffs, CEs were only to discuss Biogen's medications. However, an essential and intended component of this "education," was to steer the conversation to a discussion of Biogen's products, and then promote these medications to the physician and staff. Simply put, even though the communications made by Defendants' CEs did contain an educational component, they were promotional communications because, not only did the CEs reference the Covered Drugs, they also directly recommended the Company's products to health care professionals and patients. Further, physicians, their staff, and patients were all aware that the CE was a Biogen representative, and

therefore it is impossible to disassociate a CE's communications regarding MS medications, generally, and Biogen's MS medications. Indeed, this can be nothing other than promotion of Biogen's medications.

## V.    Defendants' Fraudulent Conduct

### A.    False Claims Act Violations

62.    Defendants have engaged in an unlawful marketing and kickback scheme with respect to its promotion of the drugs Avonex, Plegridy and Tysabri that was intended to, and did in fact, induce physicians to improperly prescribe these medications. These prescriptions were reimbursed by federal health care programs, including Medicare, Medicaid and Tricare, and therefore were issued in violation of the Anti-Kickback Statute and the FCA. As a result of Defendants' misconduct, the government has been defrauded and suffered a substantial loss.

63.    Specifically, over the last decade, Biogen has paid tens of millions of dollars in direct remuneration and "in kind" remuneration to increase market share for the Covered Drugs. As a result, Biogen received billions of dollars in sales of the Covered Drugs. Since Biogen's remuneration schemes involved three distinct payees, each scheme will be analyzed separately.

64.    Generally, kickback schemes of all types always involve two transactional parties. The first is the "payer," or the party paying the remuneration. The other is the "payee," or the party receiving the remuneration. Kickback schemes also involve a desired and intended unlawful outcome by the payer. That desired outcome includes either a "referral" or a "recommendation" for business to the payer from the payee. Although a "referral" and a "recommendation" are slightly different outcomes, each outcome is subject to AKS scrutiny. For example, a home health agency would act unlawfully if it paid remuneration to a provider to induce the provider to *refer* patients to that home health agency. In this scenario, the provider is making a direct *referral* of a

patient to the home health agency.  In pharmaceutical sales, however, this kickback transactional framework is similar, though not identical, because providers do not *refer* patients to the pharmaceutical company in the traditional sense. Instead, providers make *recommendations* by writing prescriptions for one drug as opposed to a competing drug.  In this transactional framework, a pharmaceutical company (*i.e.*, the payer) acts unlawfully if it pays remuneration to a provider (*i.e.*, the payee) in order to induce the provider to *recommend* its drug. *See, e.g.,* 42 U.S.C. § 1320a–7b(b)(2) (illegal to "knowingly and willfully offer[ ] or pay[ ] any remuneration (including any kickback, bribe, or rebate) ... to any person to induce such person" to "purchase or ... *recommend purchasing*" a drug that is covered by a federal health care program).

65.    A pharmaceutical company's violation of the AKS causes false claims to be "presented" to the government for payment.  These false claims are not directly presented by the pharmaceutical company, but rather the claim for payment ultimately comes from the pharmacy where the patient has his/her prescription filled.   Each time a pharmacy fills a patient's prescription, it submits (*i.e.*, "presents") a claim for payment to the patient's insurance carrier (*e.g.*, Medicare, Medicaid, etc.) for the drug.  When submitting these claims to government healthcare programs, all pharmacies also must certify in writing that the claim being submitted for payment is *not* "tainted," or in violation of the AKS. Yet, because the pharmaceutical company's unlawful remuneration induced the recommendation of that prescription in the first place, the certification submitted by the pharmacy *is* false because the pharmaceutical company gave unlawful "in kind" remuneration to the provider to make the recommendation.

66.    In this fashion, the remuneration that the pharmaceutical manufacturer paid in this matter "caused a false statement to be made [by the filling pharmacy] for the purpose of getting a

false claim paid."[5]  Here, Biogen (*i.e.*, the payer) acted in violation of the AKS because it gave both direct and "in kind" remuneration to the Vendor Defendants (*i.e.*, the payees) and potential prescribing providers valued at millions of dollars in order to induce recommendations of its drugs to patients.  As a result of that misconduct, the government paid false claims and suffered a substantial loss.

67.     Specifically, Biogen directly pays the Vendor Defendants to use their CEs to recommend the Covered Drugs over competing MS drugs.  As detailed below, over the last decade, Biogen has paid tens of millions of dollars to the Vendor Defendants to deploy its CEs to recommend unlawfully the Covered Drugs to both providers and patients.  This scheme is detailed in the "white coat" marketing section below.

68.     Second, Defendants pay "in kind" remuneration to prescribing providers, in the form of free services to prescribing providers, such as free clinician educators to induce those providers to recommend Biogen drugs to their patients.  This scheme follows the typical, unlawful "quid pro quo" kickback scheme, and is detailed below

69.     Third, Defendants provide prescribing physicians with free RS services as an inducement to prescribe Biogen's medication.  The RS services provided by Defendants constitute "in kind" remuneration under the AKS.  Biogen sales representatives were instructed to offer this inducement to doctors who treat MS patients and, more importantly, their office staff who are responsible for the administrative tasks associated with prescribing the Covered Drugs.  The remuneration was a tangible "in kind" benefit that greatly reduced, and in some instances completely eliminated a provider's administrative costs related to prescribing Biogen drugs.

---

[5]     31 U.S.C. § 3729(a)(2) and (a)(3) (2008); *US ex. rel. Westmoreland v. Amgen*, 738 F. Supp. 2d 267, 272 (D. Mass. 2010).

Biogen referred to these services as coverage determination and/or reimbursement support services, and it was intended to induce providers to prescribe Biogen's drugs over competitors' drugs.[6] This scheme is detailed below.

**B.   Background of Pharmaceutical Sales**

70.    Pharmaceutical companies historically have relied on product-specific in-person calls to physicians to market their drugs based on the particular drug's efficacy and patient outcomes.  Traditionally, these in-person sales calls were performed by sales representatives employed by the pharmaceutical company.  Pharmaceutical companies spend billions of dollars training their sales representatives in the craft of persuasion and influence and how to use these sales techniques to develop relationships with, and gain access to, providers who can write prescriptions for the drug they are promoting.

71.    In many instances, in order to gain access to the provider, a pharmaceutical sales representative must go through the office's "gate keeper," typically the office manager or other employee.  Once access to the provider is gained, the sales representative performs what is known in the industry as a "detail" of the drug they are promoting.  A detail is an infinitely well-rehearsed and carefully crafted "pitch" of the drug.  The sales pitch typically focuses on the drug's efficacy in treating a disease state as well as patient outcomes.  Before using the sales pitch in the field, pharmaceutical sales representatives spend countless hours training, role playing and rehearsing the pitches provided by the pharmaceutical manufacturer.

72.    In addition to the detail, sales representatives are also provided pitches and other techniques to "close" the provider.  In the field, sales representatives perform the closing pitch

---

[6] Giving RS services to providers not only reduces the costs providers would have otherwise incurred as a result of prescribing Biogen's medications.  In addition, the provision of free RS services also increases the cost of the Covered Drugs, since Biogen expends resources to employ staff to perform RS functions.  This cost is necessarily included in the cost of the drugs.

after the detail pitch.

73.     Following the detail pitch, the pharmaceutical sales representatives use other traditional and well-rehearsed sales techniques to "close" a provider.     Typically, the pharmaceutical manufacturer will provide its sales representatives with a closing pitch to use on a provider after the detail pitch.  Similar to the detail pitch, the wording of the closing pitch is carefully determined by the pharmaceutical company and well-rehearsed by the sales representative.  If successful, this process will result in a prescription drug sale for the company, which in turn is the metric used for the pharmaceutical sales representative whose compensation is typically tied in large part to a commission from that drug sale.  There can be little doubt that the pharmaceutical sales representatives' access to providers influence medical decisions.  Simple proof is the observation that pharmaceutical companies spend millions each year supporting its pharmaceutical sales representatives in the field.

74.     However, over the last decade, pharmaceutical companies have found that providers are increasingly limiting the time and access they have traditionally afforded to pharmaceutical sales representatives.  This trend is a result of the increasing burden on providers in terms of time and likely, an acknowledgment that many pharmaceutical companies and their sales representatives have, at times, engaged in less than ethical conduct in marketing their respective drugs.  In fact, as a result of this prohibited conduct and the government scrutiny followed, many healthcare systems and providers have begun to severely limit access to and, in some cases, even refuse to meet with the pharmaceutical companies' sales representatives unless the pharmaceutical sales representative has been pre-screened and approved through some form of vetting process.  The limitation of time and access to providers has been one of the biggest challenges to the pharmaceutical companies over the last decade.  Importantly, without this

coveted access, pharmaceutical companies' pharmaceutical sales representatives have little or no opportunity to have a meaningful, face-to-face interaction with providers and thus little or no opportunity to influence the prescriber's drug choice. As a result, industry wide, sales and marketing managers in pharmaceutical companies continue to seek and deploy new and innovative tactics to gain access to physicians to market their drugs.

C. **The Agreement Between Biogen and the Vendor Defendants**

75. As explained in more detail, below, Biogen entered into agreements with the Vendor Defendants to deploy CE sales representatives to sell the Covered Drugs. As Biogen attempted to capture market share for the Covered Drugs, it quickly realized that prescribers were frequently refusing to meet with the Company's pharmaceutical sales representatives. As a result, Biogen feared that, in the near future, sales of the Covered Drugs would suffer, and long term that another MS drug would capture market share and become the "go to" drug to treat MS. To combat this and gain a competitive advantage in the market place, Biogen contracted with the Vendor Defendants to deploy their CEs to promote the Covered Drugs. Specifically, Biogen entered into contracts with the Vendor Defendants, whereby the Vendor Defendants would use their much heralded "market access" expertise to help promote the Covered Drugs. In other words, Biogen retained the Vendor Defendants' CEs because, as expert clinicians, they stood in a better position to access and influence the prescribing provider than Biogen's sales representatives. This is due to several reasons. First, as clinicians, CEs are viewed by prescribers and their staff as more credible, and therefore are more apt to speak with them and accept their advice regarding the Covered Drugs. Further, prescribers view CEs as peers, and therefore are better able to overcome the office staff "gate keeper" and gain direct "peer to peer" access with providers.

76. The contract ultimately resulted in the deployment of at least of 70 of the Vendor

Defendants' CEs to market the Covered Drugs. In exchange, upon information and belief, Biogen

paid the Vendor Defendants millions of dollars, annually, for the market access the CEs provided.

77.     As discussed below, the purported reason Biogen retained the CEs' services – to

help educate providers – was a farce. Rather, the "market access" Biogen was paying for was the

CEs' ability to gain access to the prescriber, and promote and recommend the Covered Drugs.

Although a pharmaceutical manufacturer may hire clinicians as sales representatives, the CEs'

promotional activity was disingenuously labeled as MS "education" and offered to providers (and

patients as is detailed herein). As a result of these payments, CEs have been promoting and

recommending the Covered Drugs for nearly a decade and Biogen has grown into one of the

leaders in the MS drug industry as the Covered Drugs' sales have, not by coincidence,

simultaneously skyrocketed.

78.     However, because the AKS makes it unlawful for a payer, like Biogen, to give

remuneration to a payee, like the Vendor Defendants or a CE, to engage in promotional activity

and/or recommend its drugs, like the Covered Drugs, Biogen had to contrive some form of legal

construct that would shield promotional activity which so openly violates the AKS.[7] However,

what Biogen was required to do legally was, for all intents and purposes, unfeasible in practice.

That is, Biogen knew that CEs could not call on providers as drug sales agents because providers

would in turn limit CE access in the same manner that pharmaceutical sales representative access

was being limited. As such, Biogen created a clever, yet disingenuous, scheme to disguise these

sales agents and recast them as MS nurse "educators" who, rather than promoting and

recommending the Covered Drugs, were now instead marketing and promoting the free MS

---

[7]     As discussed in more detail below, the "personal services" safe harbor to the AKS in not
applicable to the agreement between Biogen and the Vendor Defendants.

disease educational services to providers and patients. This MS disease awareness program became the "cover story" for the CEs to continue to gain the coveted access to providers who could prescribe the Covered Drugs.

79.     Importantly, the Vendor Defendants are also liable under the AKS due to their respective contracts with Biogen. The Vendor Defendants knew full-well that their CEs' mission was to increase sales by acting as sales representatives. Indeed, the Vendor Defendants have made supplying drug companies with CEs to drive drug sales the primary focus of their business model. For example, inVentiv describes its CE program as follows:

Multichannel Detailing

Reaching key audiences requires a focused energy. We develop tailored and **multichannel detailing programs to ensure our clients' information gets to the physicians we're targeting. . .**[8]

Continuing, inVentiv boasts that:

Our comprehensive approach generates bright insights that **create extraordinary growth**.

Companies must now engage and motivate more healthcare stakeholders than ever before. To fuel our clients' growth, inVentiv Selling Solutions uses unique analytics to target crucial stakeholder communities. **Then we deploy highly-skilled** sales teams, **nurse-educators** and medical science liaisons **who speak their language. The result: accelerated commercial performance for our clients, day after day.**

Partner with us to reduce your fixed cost investments while **increasing your sales and marketing effectiveness.**[9]

Similarly, Ashfield boasts that it:

delivers tailored healthcare professional (HCP) education, to groups and in one-on-one settings, that focuses on optimizing patient care outcomes.

\*      \*      \*

---

[8]      http://www.inventivhealth.com/our-solutions/our-companies/selling-solutions#parentHorizontalTab2 (emphasis added).

[9]      http://www.inventivhealth.com/our-solutions/our-companies/selling-solutions#parentHorizontalTab1 (emphasis added).

> HCP educational sessions allow for greater face-to-face time with HCPs, strengthening partnerships with their sales counterparts. These relationships build brand loyalty and ultimately benefit patient care.[10]

and, that it:

> delivers tailored supplementary patient education, often in conjunction with the delivery of a clinical service (such as self-injection guidance). This has proven to be an invaluable aid to patient adherence. Patient and caregiver education can be provided in person, over the phone or virtually.[11]

and, boldly, that:

> Ashfield can design and implement patient support programs to improve the lives of patients and deliver return on investment for your brand.[12]

80.     True to the statements on their websites, Defendants' managers and pharmaceutical sales representatives ensure that the CEs do just that: drive both initial sales and "patient adherence," *i.e.* refills, as set for the below.  As such, the Defendants are liable under the federal False Claims Act and the analogous laws of the Plaintiff States.

**D.     The CEs Were Sales Representatives**

81.     The CEs Biogen used in conjunction with its promotion of the Covered Drugs were actually sales representatives.  This is demonstrated (and described in more detail, below) by the way the CEs were trained, managed, and compensated.

82.     Biogen senior management needed a clever and nuanced approach to disguise its conduct. After all, Biogen could not simply offer providers a *quid pro quo* – education and training in exchange for prescriptions – without running afoul of state and federal regulations prohibiting

---

[10]     https://www.ashfieldhealthcare.com/en/area-of-expertise/clinical-en/our-services/clinical-education/ (emphasis added).

[11]     https://www.ashfieldhealthcare.com/en/area-of-expertise/clinical-en/our-services/hands-on-patient-care/ (emphasis added).

[12]     https://www.ashfieldhealthcare.com/en/area-of-expertise/clinical-en/our-services/patient-supportadherence/ (emphasis added).

such conduct. Indeed, Biogen knew that these CEs could not openly appear to act in the role of sales representatives because they were offering valuable training and education, and such conduct violates the AKS as pharmaceutical companies are prohibited, pursuant to the PhRMA Code, from providing educational services or items with a value in excess of $100. Further, if Biogen characterized the CEs as sales representatives, their ability to market and promote the Covered Drugs would have been limited by FDA regulations. The FDA regulates the types of information pharmaceutical companies can use to inform physicians and patients about new mediations. As the CEs could not directly market Biogen's drugs without openly violating FDA regulations, Biogen created a contrived role for the CEs – one that would make them appear distinct and independent from the role of a true pharmaceutical sales representatives – as educators.

83.     As the market for MS medications has rapidly increased over the years, pharmaceutical companies have expended significant resources in an attempt to gain market share. Biogen quickly realized that the best way to secure prescriptions, and therefore establish market share, was to employ sales representatives who could easily get an audience, and develop a relationship of trust, with prescribing physicians. With this concept in mind, Biogen reached an agreement with the Vendor Defendants and deployed their CEs.

84.     The CEs deployed by Defendants accomplished both of these objectives. First, by offering CE services to physician practices, Biogen was able to easily get physicians to agree to meet with a Biogen sales representative. This is because of the value CEs provide to physician practices. Biogen naturally realized that, by offering the free services of a CE, physicians would be significantly more likely to meet with a Biogen sales representative. Their refusal would result in missing the opportunity to have a CE assist their practice, free of charge.

85.     Second, CEs are much better positioned to establish a relationship of trust with

33

physicians than typical sales representatives. CEs, as clinicians, are relied upon for their medical acumen. Thus, CEs are in the position to advise physicians on the best plan to treat their patients, and therefore build a level of trust that a sales representative would be unable to establish. Moreover, CEs, as clinicians, are more likely to be viewed as peers by physicians. This bond further allowed Biogen's CEs to foster relationships with physicians that a typical sales representative would be unable to develop.

86.     But merely gaining access and building relationships with physicians through educators would not accomplish Biogen's goal: to gain market share for the Covered Drugs. This, however, required physicians to prescribe its medications to their patients. To accomplish this, Biogen needed sales representatives, not educators. Thus, Biogen decided to train its CE team to function as sales representatives in every aspect, except title. By doing this, Biogen was able to gain access and build trust with physicians while, at the same time, promoting its products.

### 1.     **Defendants Train CEs in Pharmaceutical Sales**

87.     The training Biogen provided to the CEs was akin to the training received by its sales representatives. Indeed, Defendants recognized that most, if not all of its CEs had no sales experience or training. Therefore, the CEs' training focused primarily on sales tactics to promote Biogen's drugs to providers.

88.     The training provided to the CEs lasted several weeks, and consisted of at-home training as well as in-person training at the companies' respective headquarters and during Biogen national conferences held in Dallas and Las Vegas. The training provided to the CEs was almost identical to the training provided to sales representatives. For example, CEs were taught how to "detail" the Covered Drugs as well as other common pharmaceutical sales techniques such as gaining access to the provider/overcoming the office gatekeepers and sales objections.

89.     The most intense sales training occurred in 2013 at Biogen's national sales conferences in Dallas and Las Vegas. According to the Confidential Witnesses ("CWs"), at the sales conferences, CEs worked directly with Biogen's sales force in role-playing exercises, overcoming objections, and other sales exercises. For example, according to CW1,[13] Defendants even brought in stage sets and professional actors to participate in the role-playing exercise. Indeed, the training provided to the CEs was almost identical to the training pharmaceutical sales representatives receive at every pharmaceutical company.

90.     The comprehensive sales training Defendants provided to the CEs was necessary for them to effectively promote the Covered Drugs because almost all of the CEs were clinicians, with no sales experience or training. According to CWs, many of the CEs were very surprised at the training Defendants provided because when they applied for the job the CE position was described as an educational in nature. However, the CEs quickly learned that their job was really to sell the Covered Drugs.[14]

### 2.     The CEs Functioned Like Sales Representatives

91.     After completing the sales training, Defendants deployed the CEs across the country to target potential prescribers of the Covered Drugs.   The CEs worked in close coordination with Biogen's sales representatives to promote the Covered Drugs.  At the day-to-day level, this typically involved each territory's CEs and pharmaceutical sales representatives

---

[13] CW1 served as a Biogen CE from 2007 until 2009.

[14]     In order to further the sales process, CEs were trained to use a sales call note portal system to meticulously record each encounter with a target provider. So important was this data collection, according to CW4, for example, that Ashfield CEs received weekly training updates from regional managers regarding inputting data into Ashfield's program called "Access."  This aspect of the CEs' job further illustrates that CEs functioned as sales representatives. If the CEs' goal was purely educational, why would Biogen and the Vendor Defendants impose the burden of documenting each encounter with a provider using sales software?

coordinating calls based on prescribing data.

92.     Specifically, Defendants provided CEs with lists of physicians to be "targeted" for calls based on IMS prescribing data. The target list provided to each CE contained approximately 125 potential prescribers, mostly neurologists, and were similar, if not identical, to the target lists distributed to Biogen's sales representatives. According to CW2,[15] CEs use the lists to collaborate and coordinate with Biogen's sales team as well as to designate "high-volume" prescribers and the frequency at which the CEs needed to visit their offices. The target list categorized providers in different tiers depending on how many prescriptions of the Covered Drugs they stood in a position to write.

93.     The target list categorized prescribers as either "tier one," "tier two," or "tier three" prescribers. Tier one prescribers were the physicians with the potential to write the greatest number of prescriptions for the Covered Drugs. These doctors were almost always neurologists who were considered key opinion leaders, and regularly prescribed Avonex. According to CWs, CEs were required to call on tier one prescribers at least three times per quarter. Tier two prescribers were the next priority for CEs. Tier two prescribers were typically providers who were prescribing Avonex, but had little room for volume growth. Tier two prescribers did prescribe Avonex, but not as much as tier one prescribers, and therefore CEs would call on them less frequently. Tier three prescribers prescribed even less of the Covered Drugs than tier two physicians, and therefore CEs called on tier one physicians infrequently.

94.     The close collaboration between CEs and Biogen's sales representatives did not end with shared target lists and goals. For example, according to CW3,[16] she and her sales

---

[15] CW2 served as a Biogen CE since 2013 in the southern United States, employed by Ashfield.

[16] CW3 served as a Biogen CE since 2015 in the Midwestern United States, employed by Ashfield.

representative counterparts would have a disposition call every Monday. During this call, sales representatives would discuss pending prescriptions of the Covered Drugs so CW3 could schedule device starts with these patients. In reality, however, this meeting allowed the sales team to plan their sales activities around CW3's "educational" activities and her follow-up "injection reports."[17] CEs would then document their experiences at the office – who the gatekeepers were, how she was received etc. – and provide this business intelligence to Biogen's sales representatives. This allowed for more effective sales calls and helped Biogen gain access to otherwise impenetrable offices.

95.     After gaining access to prescribers under the auspices of an MS disease education service, the Vendor Defendants' CEs (*i.e.* "white coated" clinicians recognized as experts in MS treatments) were now also in a prime position to recommend, exclusively, the Covered Drugs to providers and, more troubling, directly to patients, as discussed below.

96.     The scheme just described demonstrates how the Vendor Defendants' CEs and Biogen pharmaceutical sales representatives coordinated to drive prescriptions from targeted prescribers, and demonstrates the disingenuous nature of Biogen's MS "educational" offerings. If the CEs' goal was "education," then there would not be any legitimate rationale for coordination of the activity between a supposed independent CE, whose role is to educate about MS, and a pharmaceutical sales representative. This nexus demonstrates that the true purpose of targeting specific providers for "education" was to put the CE in a position of influence and thereby increase providers' prescriptions for the Covered Drugs.

---

[17]     After performing a device training, CEs prepare injection reports detailing the encounter, which is then given directly to the provider by the CE. This provided another opportunity for a CE to gain face-time with a potential prescriber.

**E.**   **Scheme One: White Coat Marketing**

97.     The CEs' job responsibilities were divided into two categories: direct patient

contact in the form of post prescription device training and follow-up and directly promoting and

recommending the Covered Drugs to healthcare providers.[18]

98.     After being provided the target lists from Defendants, the CEs would call on the

targeted providers under the guise of offering "free educational services." However, this was

offered solely to get an audience with the prescribing physician. Specifically, CEs were regularly

able to bypass the office's administrator or receptionist and get an audience with an office's

decision maker by identifying themselves as a nurse from Biogen and asking to speak with the

physician's personal nurse. As the physicians called on by the CEs were specifically selected by

Defendants, almost all of them had at least one patient on a Biogen drug. CEs would tell the

provider or his/her nurse that they have an "injection report" for that patient, and would like to

review it with the physician. It was in this way, among others, that CEs, armed with branded

information regarding the Covered Drugs and visual aids, were able to use their clinical credentials

to get an audience with prescribers that sales representatives could not access. However, after

gaining access under the pretense of reviewing specific patient clinical outcomes using Biogen's

drugs, the CE deliberately transitioned to a promotional pitch of the Covered Drugs.[19]  According

---

[18]     CW3 states that she spent 75% her time with providers promoting the CE services and 25% discussing the product.

[19]     And, as above, CE access (albeit improperly obtained) translated to increased access for Biogen's pharmaceutical sales representatives.     Additionally, CW3 explains that the pharmaceutical sales representatives also successfully leverage CEs' post prescription "success stories." That is, pharmaceutical sales representatives will bring CEs like CW3 into providers' offices during sales calls and introduce them as "the nurse who was seeing patient X," explaining to the provider that the patient is doing well because of the CE's efforts, that the patient is doing so well. In this way, Biogen was able to maximize messaging provided to the potential prescriber.

to CW3, at the appropriate time, she would inquire whether the provider had any patients who might have a need for or benefit from a Biogen medication.

99.    The main force of the CEs' sales pitch was to extol the benefits of the Covered Drugs, and then to transition that discussion to asking the provider to prescribe a Biogen drug to their patients.[20] For example, after discussing the benefits of the Covered Drugs, CEs would ask the prescriber to switch their patients from a competitor's drug, such as Copaxone, to Biogen's Avonex. Further, the injection reports were also used as an opportunity to secure prescriptions. Specifically, when a CE would return to a provider's office with the injection report, they would ask the physician whether they had any other patients they wanted to start on a Biogen drug.

100.    Another major emphasis for CEs was relationship building.   Just like sales representatives, the better relationship a CE can forge with a provider or patient, the greater the likelihood that they will have more loyalty to the medication's manufacturer.   Relationship building was also extremely vital to getting the provider to agree to meet with a Biogen sales representative.   If the CE had forged a strong relationship with the provider or their office staff, they were more likely to allow a Biogen sales representative to come into their office to promote the Covered Drugs.

101.    Defendants' CEs, in some instances, were better able to influence a provider's decision-making than their sales representative counterparts.   As already discussed, CEs are viewed by providers and their staffs as peers, and the fact that they were clinicians also afforded them greater credibility than a typical sales representative.   In addition, according to CW4,[21] after

---

[20]    These benefits included lower injection frequency, lower relapse rate and greater adherence.

[21] CW4 served as a Biogen CE since 2013 in the Midwestern United States, employed by Ashfield.

a CE had an opportunity to work with one of a provider's patients, they were better positioned to subsequently secure more prescriptions for the Covered Drugs. This is because, when promoting Biogen's drugs, the CE could point to specific patients of the provider they had previously treated and provide their take-away from the patient encounters and share success stories on post-injection follow-up visits. The ability to discuss with providers specific patient outcomes using Biogen's drugs was very influential in influencing a provider to prescribe a Biogen drug. Biogen's sales representatives were not in such a position, and therefore, in many instances, CEs yielded much greater influence over providers than did sales representatives.

102. Defendants' compensation structure for CEs also demonstrates that they were, in everything but title, sales representatives. Indeed, the methodology used to reward CEs was directly tied to their true purpose: increasing prescriptions. Specifically, Defendants provided CEs with a 10% bonus if certain metrics were met. These metrics included: (a) responding to a referral in less than 24 hours; (b) perform patient training within five days of a referral; and (c) report back to the prescribing physician within ten days of a referral. In addition, as part of their bonus metrics, CEs were required to make a certain number of calls on targeted physicians per quarter. Specifically, CEs, to be bonus eligible, had to call on tier-one providers three times per quarter; tier-two providers twice per quarter, and tier three providers once per quarter.

103. CWs also report additional metrics. For example, CW5[22] stated that her metrics included turnaround time for the first injection training (*i.e.*, new prescriptions), whether the patient was still on the drug after six months; and whether the patient was staying on therapy. CW5 further states that because one of the metrics included new prescriptions (*i.e.* first injection

---

[22] CW5 served as a Biogen CE manager from 2013 to 2014 in the northeastern United States, employed by Ashfield.

training), CEs were incentivized to convince physicians to switch patients from their current medication to Avonex. Of note, none of the CEs' bonuses measure in any meaningful way the extent to which patients are being educated, patient health outcomes or any other metric unrelated to physician "access" and/or sales.

**F.     Defendants' Scheme is not Protected By the AKS Safe Harbors**

104.    For the last 25 years, most of the successful pharmaceutical *qui tam* lawsuits have had, as their central theory of liability, unlawful remuneration which flowed directly from drug companies to prescribers – usually doctors – as illustrated below with the arrow labeled A.



105.    As is detailed above, the last decade has seen the evolution of yet another unlawful remunerative scheme spearheaded by the drug companies (Arrow C). The remuneration flows to nurses who, in turn, recommend drugs (here, the Covered Drugs) to both patients and doctors (Arrow D).

106.    Congress, when enacting the AKS, did not limit the AKS's reach solely to unlawful

remuneration to doctors. Instead, the AKS was intentionally drafted expansively in order to reach any and all remunerative conduct, whether it be cash, in-kind, direct or indirect – so long as the remunerative conduct was intended to "induce" any person to "recommend purchasing" any item that will be paid for by a government healthcare program. *See* 42 U.S.C. § 1320a-7b *et seq.*

107.    Although Biogen's remuneration flows through a slightly different channel to a nurse (Arrow C) rather than to a doctor (Arrow B), this conduct is prohibited by the AKS if the desired outcome of the remuneration is to induce a recommendation of a drug. That is, under the AKS there is no difference between a drug company's remuneration to a nurse, a doctor or, say a "carnival barker"; if one part of that remuneration is intended to induce a recommendation of its drug the conduct is unlawful. In this case, the CWs confirm that Biogen is paying remuneration to CEs to recommend the Covered Drugs to doctors (Arrow E) and patients (Arrow D). Such conduct violates the AKS.

108.    Although conduct may violate the AKS, there are certain well-defined, but limited circumstances in which it may be protected from prosecution. In 1987, Congress authorized HHS/OIG to issue regulations designating specific safe harbor exceptions for various arrangements and business practices within the healthcare industry that, while otherwise prohibited, would not subject a company to liability under the AKS. Since the safe habors are essentially an "immunity" statute, HHS/OIG requires that an arrangement fit squarely into the safe harbor exception in order for it to be protected. As such, the next step in this analysis is to determine whether the conduct, though violative of the AKS, is nevertheless protected by a safe harbor. There are only two possible safe harbor exceptions that could be applied to this matter: the "personal services" and the "employee" safe harbors. As is detailed below, neither protect Defendants in this case.

### 1.   Defendants Cannot Avail Themselves of the Personal Services Safe Harbor

109.   The personal services and management contracts safe harbor to the Anti-Kickback Statute ("personal services safe harbor") protects many marketing activities by health care providers and suppliers from liability under the Anti-Kickback Statute. *See* 56 Fed. Reg. 35952, 35974 (July 28, 1991) ("many advertising and marketing activities warrant safe harbor protection under the personal services and management contracts safe harbor."). Pursuant to the personal services safe harbor, remuneration does not include "any payment made by a principal to an agent as compensation for the services of the agent" as long as the following requirements are met:

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d).

110.   The agreement between Biogen and the Vendor Defendants does not satisfy the

safe harbor requirements in 42 C.F.R. § 1001.952(d)(2), (5), (6) and (7). Therefore, Defendants cannot avail themselves of the personal services safe harbor to shield themselves from liability.

### a.   Defendants Did Not Comply with 42 C.F.R § 1001.952(d)(2)

111.    First, the arrangement between Defendants fails to satisfy the personal services safe harbor requirements because the agreement does not cover "all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent." Thus, Defendants have failed to comply with the requirements of 42 C.F.R. § 1001.952(d)(2).

112.    Although the precise terms of the written agreement are unknown by the CWs, the contract could not have covered all of the services to be performed, unless, of course, Defendants put an agreement into writing which, on its face, violates numerous rules and regulations. In other words, if the contract between Defendants required CEs to promote and market the Covered Drugs, this would violate numerous sections of the FDCA. Thus, it is reasonable to conclude that the agreement does not cover all of the services that the CEs were hired to perform, particularly, using CEs to gain "access" to providers and to "recommend" and promote Biogen's drugs to both providers and patients.

113.    This conclusion is inescapable based on the differences (or lack thereof) between the role of Biogen's pharmaceutical sales representatives as compared to the role of the Vendor Defendants' CEs, especially when considering the rules and regulations that govern and constrain the conduct of each distinct role.

114.    Fundamentally, pharmaceutical sales representatives promote drugs while CEs are supposed to promote disease awareness education. While the FDA has overarching authority over drug promotion by a pharmaceutical sales representative, it does not have the same authority over,

nor do the same rules regulate, disease awareness education promotion provided by a CE.[23]  The

differing FDA rules for "drug promotion" and "disease awareness" are each discussed in turn

below.

115.    A pharmaceutical sales representative's promotional activity is defined as conduct

that contains representations about or concerning a particular drug.  The pharmaceutical industry

refers to this activity as "branded" interactions.  Thus, for example, any promotional activity

involving particular drugs, such as the Covered Drugs, is considered a branded promotion.

Pharmaceutical sales representatives live and work in this "branded" territory, and because drug

reps are first and foremost motivated by sales and commissions, the FDA imposes numerous

restrictions on pharmaceutical sales representatives' branded discussions.  For the most part,

pharmaceutical sales representatives are constrained by the FDA-approved written "Package

Insert" or "PI" that contains the drug's FDA mandated disclosures (*i.e.*, indications, warnings, side

effects, etc.) and any other FDA approved materials.  These FDA rules and regulations prohibit a

pharmaceutical sales representative from making promotional claims or representations about a

drug unless they are contained in the FDA approved material.  Further, since pharmaceutical sales

representatives are sales people, not clinicians, the FDA prohibits drug reps from making disease

awareness claims or representations on subjects such as diet, exercise, and/or other healthcare

related matters.  Rather, information about diseases and/or health matters are within the province

of a clinician, such as a CE and/or a patient's provider.

116.    Importantly, pharmaceutical sales representatives must refer any question

regarding disease awareness to either the patient's provider or a CE.  This restriction necessarily

results from the fact that disease awareness education is not part of the FDA's approved

---

[23]       *See, e.g.,* 21 U.S.C. § 352(a) and (n).

promotional material. The FDA permits pharmaceutical sales representatives to promote drugs for the drug company that employs them. However, the FDA does not permit pharmaceutical sales representatives to provide independent health education. These compliance guardrails exist to protect consumers' health and welfare from pharmaceutical sales representatives who may make representations about a drug that are not FDA approved. Making such representations constitutes unlawful off-label promotion.

117.    Conversely, unlike drug promotion, disease awareness education is intended to be disseminated to patients and/or providers in order to discuss a particular disease or health condition. Disease awareness communications cannot include any mention of a specific manufacturer's drugs. The industry refers to this activity as "non-branded" communications. CEs engage, almost exclusively, in non-branded communications.[24]   A CE's role is to provide independent, generic (*i.e.*, not product specific), non-branded information related to disease awareness education. As discussed above, CEs are typically registered nurses, and therefore have an independent duty of care to patients and must act in their best interests. Importantly, since it is not the role of a CE to promote a drug, CEs' interactions with providers, their staff and patients does not fall under the FDA's oversight. As such, the non-branded communications given by a CE, on behalf of a drug company, are not subject to the same FDA restrictions as a pharmaceutical sales representative's branded drug promotional activities.[25]

---

[24]    There are some limited exceptions when CEs can use branded material, in particular when doing post-prescription device training.

[25]    *See generally*, FDA Draft Guidance "Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms. FDA–2004–D–0500 (January 26, 2004) which was subsequently withdrawn in May 2015. As a result, the pharmaceutical industry must rely on guidance from 1985/1988, which provides that activity is considered promotional in nature (and therefore subject to the labeling requirements) if it "effectively promote[s]" a specific drug. *See* Clarification of Policy on Institutional, Corporate, or Health Message Advertising (September 1985) and Institutional/Disease-oriented Advertisements (June 3, 1988).

118.   Thus, in sum, a clinician can be an educator or a pharmaceutical sales representative, but not both.  In other words, a clinician can be a CE and provide independent disease education without any drug-specific references, and be free of FDA's oversight; or, a clinician can be a sales representative and promote a drug subject to the constraints the FDA places on pharmaceutical sales representatives.  A CE cannot, however, be given an "educator" title, while functioning as a sales representative, and still be free of the FDA's regulation.  Indeed, if the CE is promoting a drug, and makes claims about a drug that are not within the scope of the FDA approved materials, they are engaging in unlawful off-label promotion.

119.   Based on the foregoing, it is clear that Biogen's agreements with the Vendor Defendants does not meet the requirements contained in 42 C.F.R. § 1001.952(d)(2) of the personal services safe harbor.  Here, the focus is on the "services" by the CE as set forth in the agreement between the parties.  First, the agreement between Biogen and the Vendor Defendants likely described the nurses as "educators," which is consistent with the job title and description, and specified that the CEs were to provide disease state awareness "educational" services.  Indeed, all CWs confirm that a part of their services was, on its face, educational in nature – after all it was the purported "educational" services that permitted them to gain access to promote drugs in the first place.  Therefore, it must logically follow that the agreement did not specify that the CEs were to engage in promotional or sales activities.  This conclusion is bolstered by the fact that, had Defendants contracted to have the CEs promote the Covered Drugs to providers and patients, under the guise of an "educator," the contract, on its face, would clearly violate the FDCA's rules on drug promotion.[26]

_____

[26]   Although, and as discussed herein, Defendants intentionally attempted to circumvent the FDCA's regulations on promotional activity by labeling "sales representatives" as "educators," it is highly doubtful that such a prohibited arrangement would be reduced to writing.  However, if it

120.     Further, *if* Biogen and the Vendor Defendants stated in the agreement that the CEs were also going to promote the Covered Drugs, then all of the CEs' activities would have been constrained by, and in violation of, FDA approval requirements.  This would have effectively prevented the CEs from providing independent disease awareness education because those materials were not FDA approved.

121.     As stated above, once CE communications concern a specific drug, the CE becomes subject to the same limitations and prohibitions as a pharmaceutical sales representative, and therefore cannot use non-approved FDA materials.  In other words, once a CE engages in branded drug promotion, the FDCA prohibits the CE from providing independent disease awareness education because that education would not be part of the FDA approved materials.  Engaging in such conduct violates the FDA's off-label prohibitions.

122.     Considering the analytical framework, the terms of the agreement between the parties required a specification that the Vendor Defendants' CEs were *either* promoting the Covered Drugs, *or*, conversely, disseminating independent disease education.  However, it is inconceivable that the agreement would be drafted to thread the needle of the FDA guidance and accurately state that the services of the CE included *both* drug promotion and disease awareness promotion.[27]  The agreement, however, could not have provided that the CEs serve both functions

---

were, Defendants would still be unable to avail themselves of the personal services safe harbor because the agreement would violate 42 C.F.R. § 1001.952(d)(5), (6), and (7).

[27]     The FDA further constrains situations where independent disease awareness materials, which otherwise meet the requirements for such, may still be considered promotional materials, and thus be subject to the FDA's labeling requirements.  This occurs when the disease awareness communications are presented in combination with promotional communications.  In deciding whether this has occurred, the FDA looks at (A) whether the materials look similar; and (B) whether they are presented together.

because, as discussed above, this would violate FDA rules and regulations.[28] This syllogism is quite damning because in drafting an agreement, the parties had to choose between either:  1) signing off on an agreement that included services that would include "off-label" promotion, thus violating the FDA regulations; or, 2) signing off on an agreement that ignored the drug promotion service.

123.   Given as much, it would be unreasonable to conclude that Biogen's compliance department would countenance a contractual arrangement that, on its face, would expose Biogen to liability for off-label/misbranded marketing, among other violations.   Rather, the only reasonable conclusion is that the written contract between the parties called for only non-branded "education services."

124.   Thus, since the CEs' drug promotion services were always part of the "deal" between the parties, their absence in the agreement results in an agreement that fails to "cover[] all of the services the agent provides to the principal for the term of the agreement and [fails to] specif[y] the services to be provided by the agent" required by 42 C.F.R. § 1001.952(d)(2). Moreover, even if decision to have CEs engage in drug promotion was made after the contract, and therefore not always part of the "deal," it would still fail to meet the requirements of (d)(2) because the CEs are performing services not covered by the agreement.

**b.      Defendants Did Not Comply With 42 C.F.R. § 1001.952(d)(5)**

---

[28]     To the extent the agreement did provide for the CEs to both promote the Covered Drugs and provide disease awareness communications, this arrangement would violate the FDCA. The only possible reason the agreement would require CEs to serve both functions would be to circumvent the FDCA by labeling the CEs as "educators," free from the FDA's restrictions, while acting as sales representatives. Such a "form-over-substance" arrangement, entered solely to, escape FDA regulation, is to be ignored because the proper regulatory framework to apply to CEs activity is based upon how the CE functions in practice, not the label attached to them by Defendants.

125.    Defendants cannot avail themselves of the personal services safe harbor because (1) the compensation paid pursuant to the agreement between Defendants was not set in advance and (2) the amount of compensation to be paid under the contract was determined in a manner that takes into account the volume or value of referrals generated pursuant to the agreement.  In order to fall within the personal services safe harbor, an arrangement must comply with 42 C.F.R. § 1001.952(d)(2), which requires that:

> The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

126.    Although the actual contractual terms likely mask the correlation between sales of the Covered Drugs and CE bonuses, as demonstrated above, the metrics used by Defendants for CE bonuses are closely intertwined with the number of prescriptions secured, physician calls and new patient trainings.  For example, the need for a CE to provide new patient trainings only arises when a new prescription has been secured.

127.    Thus, CE bonuses are tied to volume of prescriptions secured (*i.e.*, sales).  As a result, CEs have a vested interest in securing as many prescriptions as possible.  Therefore, Defendants' CE bonus structure demonstrates that the aggregate compensation paid under the agreement to any CE cannot be "set in advance" and *is* "determined in a manner that takes into account the volume or value of referrals."

128.    It also is reasonable to conclude that the agreements between Biogen and the Vendor Defendants does not set in advance the "aggregate compensation paid to the agent [the Vendor Defendants] over the term of the agreement."  Bonus compensation, by its very nature, is not set in advance as it is conditioned on performance and metrics.  If each individual CE's

aggregate compensation is not set in advance, it would be impossible for the aggregate compensation under the agreement for CE services to be set in advance. Similarly, since the CE's bonuses are based on sales, the aggregate payment from Biogen to the Vendor Defendants must also be "determined in a manner that takes into account the volume or value of referrals." This is true even if Biogen paid the Vendor Defendants in a lump-sum payment, set in advance, because that payment *must* have contemplated CE bonuses and is therefore "determined in a manner that takes into account the volume or value of referrals."

129.    For the aforementioned reasons, the agreement fails to satisfy 42 C.F.R. § 1001.952(d)(5).  Therefore, Defendants cannot avail themselves of the personal services safe harbor.

### c.    Defendants Did Not Comply With 42 C.F.R. § 1001.952(d)(6)

130.    The personal services safe harbor is also not applicable to Defendants because, as discussed above, the services performed by the Vendor Defendants on behalf of Biogen violated the federal FCA and AKS, along with various other state and federal rules and regulations. Thus, Defendants failed to comply with the requirements of 42 C.F.R. § 1001.952(d)(6) because the services performed under the agreement involved "the counselling or promotion of a business arrangement or other activity that violates any State or Federal law." Moreover, the conduct discussed above also violates the FDCA's rules regarding drug promotion. Therefore, even if Defendants' conduct did not violate the FCA or AKS, the fact that the arrangement between Defendants necessarily required the FDCA to be violated prevents Defendants from utilizing the personal services safe harbor.

### d.    Defendants Did Not Satisfy 42 C.F.R. § 1001.952(d)(7)

131.    The agreement between Defendants also fails to satisfy 42 C.F.R. § 1001.952(d)(7)

because the aggregate services contracted for exceed "those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services."

132.    This conclusion is based on the above conclusion that services specified in the written agreement are most likely limited to the "education" services. *If* Biogen management only intended non-product specific, independent disease awareness education (which would be commercially reasonable), then the metrics, the reporting, and the collaboration efforts detailed above would not be necessary to accomplish this purpose. Many of these services relate directly to sales, not education.

133.    Further, there can never be a "commercially reasonable business purpose" where a drug company pays millions to a third-party to induce it to deploy nurses to gain "access" under the false pretense of providing independent and impartial disease awareness education when the true purpose is to promote drugs and provide remuneration to providers. Thus, this element of the personal service exception also cannot be met.

## 2.    Defendants Cannot Avail Themselves of the Employee Safe Harbor

134.    The employee safe harbor to the AKS exempts from AKS's definition of "remuneration" any "amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in furnishing of any item or service" paid in whole or in part by a government healthcare program. 42 C.F.R. § 1001.952(i). The CEs were employees of the Vendor Defendants, not Biogen. Therefore, the AKS's employee safe harbor is inapplicable to the Defendants' arrangement.

135.    The employee exception protects remuneration paid by a drug company to a bona-fide employee. Drug companies compensate their sales representatives for the drugs they sell pursuant to this safe harbor. However, this exception only applies to "bona-fide employees" of

the pharmaceutical company, not third-parties it retains to work on its behalf.

136.   HHS/OIG has spoken directly to this issue.   Specifically, in 1989, HHS/OIG explicitly rejected a proposal to extend the employee safe harbor to "independent contractors" – those who fall outside the bona-fide employee status – stating:

> [w]e have declined to adopt this approach because we are aware of many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision. We believe that if individuals and entities desire to pay a salesperson on the basis of the amount of the business they generate, then to be exempt from civil or criminal prosecution, they should make these salespersons employees where they can and should exert appropriate supervision for the individual's acts.

54 Fed. Reg. 3088, 3093 (January 23, 1989).

137.   As OIG/HHS made clear, the employee safe harbor does not apply to remuneration paid to non-employees, regardless of whether the non-employee is categorized as an independent contractor or otherwise.

138.   The issue of third-party agents was again addressed by HHS/OIG in 1991.  In the first draft of the AKS's safe harbor regulations, HHS/OIG flatly rejected requests to extend the employee exception to third-party agents. In addition to the same language used in the 1989 release, OIG stated:

> Although [some in the industry] asserted that [it] could achieve appropriate supervision and control of independent contractors by including restrictive terms in the contract, we cannot expand this provision to cover such relationships unless we can predict with reasonable certainty that they will not be abusive.

56 Fed. Reg. 35952, 35981 (July 29, 1991).

139.   In this matter, the distinction between Biogen's employee pharmaceutical sales representatives and the Vendor Defendants' CEs, who are independent contractors, is the operative reason the employee safe harbor is inapplicable in this matter. Since the Vendor Defendants' CEs are not Biogen employees, remuneration exchanged for these services are not protected by the

employee safe harbor.

G.     **Scheme Two: Free CE Services in Exchange for Referrals**

140.     Defendants also violated the FCA by providing prescribers with valuable "in kind" remuneration, in violation of the AKS. The primary incentive Defendants provided prescribers and potential prescribers was the CE's services. The CE services Defendants provided alleviated the costs to providers involved with aspects of patient care and staff education. That is, in the absence of the CEs' services, providers would have to hire a staff member, or devote current employees' time, to performing the same responsibilities.

141.     Defendants' main purpose in providing the free services discussed herein was to induce prescriptions for the Covered Drugs from prescribing physicians. This is confirmed by Biogen's sales representatives as well as the Vendor Defendants' CEs. Indeed, from the very start, Defendants' management engrained in the CEs that their goal was to secure prescriptions by offering free services to targeted high volume prescribers.

142.     This is demonstrated, in part, by the method Defendants used to determine the level of services they provided to a practice. Specifically, the level of services Defendants provided was directly correlated to the number of prescriptions the provider wrote for the Covered Drugs. In other words, the more prescriptions a physician wrote for Biogen's products, the more on-site time and access to the CE the practice would receive. Further, as described below, CEs took an active role in managing providers' patients prescribed to one of the Covered Drugs; however, this service was only provided to providers who prescribed a Biogen product. If that provider chooses a competitor's drug, the CE will stop the regularly scheduled visits. As a result, and as Defendants intended, CEs were able to "induce" or "cause" providers to write more Biogen prescriptions. That is, Defendants intended the free services to induce providers to recommend and prescribe Biogen

54

drugs to their patients.[29]

### 1.   Background Information Regarding the Value CEs Provide to Practices

143.   CEs are in high demand by MS care providers and can benefit them in myriad ways. Despite their value, for most providers it is not cost effective to keep one on staff.[30]  As a result, providers will typically assign a staff member to perform duties typically performed by a full-time CE.  Knowing this, Biogen developed a marketing strategy to induce prescriptions of the Covered Drugs by providing CE services to MS providers, free of charge.  The services provided by Defendants' CEs included, but are not limited to: (a) helping providers increase practice efficiency; (b) staff training on MS care; (c) eliminating the administrative expense of teaching patients MS injection; and (d) being "on call" to answer a provider's patient's questions related to MS care.

144.   These services were so valuable to MS providers that the CEs' free services became the focal point of Biogen's sales representatives' pitch to providers.  That is, rather than promoting and marketing its drugs on patient outcomes and efficacy, Biogen, through its pharmaceutical sales representatives and the Vendor Defendant CEs, instead focused on the value its CEs could provide the practice if they prescribed their patients to the Covered Drugs.  By providing the CEs' services free of charge, Defendants "eliminate[d] an expense that [the provider] would have otherwise incurred"[31] if they had employed the CE.   Such in kind remuneration, provided as an inducement

---

[29]      Nor can Biogen contend that the illegal scheme set forth herein was the work of the Vendor Defendants, done without anything less than Biogen's knowledge and blessing.  As discussed herein, Biogen and the Vendor Defendants conducted CE training jointly, shared data in conjunction with physician targeting and, upon information and belief, had a financial arrangement that contemplated CEs' successes in infiltrating providers.

[30]      The annual salary, alone, for CEs ranges from $50,000 to $100,000, and per diem CEs can contract at an average hourly wage of $40.00 per hour.

[31]      Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23737 (May 5, 2003) (stating that goods and services provided to a physician that "eliminate an

to recommend a Biogen drug, is an unlawful kickback under the AKS.

### 2.    Office Education Services

145.    Defendants provided potential prescribers, through its CEs, MS best practices educational services.   The educational services Defendants offered and provided had an independent monetary value to providers.  The education service have a monetary value in the healthcare industry - typically, independent CEs and/or consultants charge thousands of dollars to provide these types of education services to providers.  Biogen management was aware of this, and nonetheless offered it because they knew it would entice providers.

146.    The educational services consisted of Defendants' CEs working directly with a provider's staff to train them in MS care.  For example, Defendants' CEs conducted lectures and presentations for the provider's staff.  Further, CEs also worked with the provider's staff and patients in a "train the trainer" model.  That is, CEs would train the provider's staff member on how to train patients to correctly administer the Covered Drugs.

147.    According to CWs, the CEs' educational services were offered as an inducement to secure prescriptions for Biogen's medications.  Significantly, CEs were not permitted to provide general MS training to staff.  Rather, they could only teach them about Avonex.  According to CW6,[32] in practice, however, CEs would informally answer general MS questions from providers' staffs.  And, while these education services may not be as tangible as the more traditional inducements, Biogen pharmaceutical sales representatives messaged this education service as potentially having a greater value to the providers.  When providers accepted this offer, the

---

expense that the physician would have otherwise incurred (*i.e.*, have independent value to the physician) . . ." could violate the AKS).

[32] CW6 served as a Biogen CE from 2012 to 2015, employed by inVentiv from 2012 to 2013, and Ashfield from 2013 to 2015.

provider also received the benefits of the CE's educational services, free of charge, and thus "eliminate[d] an expense that [the provider] would have otherwise incurred"[33] if they employed the CE. This form of in kind remuneration is an unlawful kickback.

### 3.   Direct Patient Management and Training Services

148.   In addition to training providers' staffs, Defendants' CEs also worked directly with their patients to provide management and training educational services. *As with the staff training services, these patient education services were designed to teach and help manage a providers' MS patients.* The use of Defendants' CEs to train patients was so well received by providers that Biogen pharmaceutical sales representatives relied heavily on this offer when promoting Biogen medications at providers' offices.

149.   Similar to the other CE services, the patient education and training services Defendants provided had an independent value to providers. Absent a free CE to train their patients, providers would either have to incur the administrative time and expense to perform the services themselves or hire an outside consultant to provide the CE service. *Indeed, the patient training was valuable to practices because it saved staff time, and therefore saved money and resources. And Biogen offered to provide this skilled CE for free in order to induce referrals.*

150.   Patients were required to enroll in Biogen's CE program to receive education and training from the CEs. This process started with the provider sending a start form to the Biogen hub, which CW6 believes was called "MS Active Source." The form served as an order to start Avonex, and was sent to the Patient Services group at Biogen. The form would be channeled to a

---

[33]   Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23737 (May 5, 2003) (stating that goods and services provided to a physician that "eliminate an expense that the physician would have otherwise incurred (*i.e.*, have independent value to the physician) . . ." could violate the AKS).

case manager who would then conduct a welcome call with the patient to outline the steps needed to get the patient started on the medication.

151.    Ashfield would have a consent form for patients to sign, in which the patient would agree to accept the education from the nurse.  Once the consent form was signed, the nurse would work directly with the patient.  The CEs would train the provider's patient on how to use the different medication administration devices associated with the Covered Drugs and their side effects.  Further, the CEs would help manage patients after being prescribed to a Biogen medication, thereby alleviating that responsibility from providers and their staffs.  For example, as part of the pre-prescription value proposition, CW3 told doctors that once a patient was prescribed to a Biogen medication, she would personally provide device training in the patient's home and the patient could contact the CE instead of the office for questions.  CEs were trained to explain to providers and their staffs that providing a go-to expert as a patient resource for medical questions would save the practice time, money, and aggravation.

152.    After the physician prescribed, and the patient received the drug, a Biogen case manager would contact the CE who would then make an appointment to train the patient.  In many instances, the training occurred one-to-one at the patient's home, and mainly focused on how to titrate and inject the drug by needle and injection pen as well as disease state training.[34]  Patients usually must titrate into the full dose, so the CEs educated them on both.  During the titration process, the CE would have a few calls with the patient to ensure that there were no issues.  If there were no issues, someone from Biogen's Patient Services Group would continue to contact the

---

[34]    Titration is the process through which a drug is slowly introduced to a patient, starting with a small dose and gradually increasing the amount administered until they reach a full dose.  Avonex requires titration.  According to CW4, after the fourth week, the CE would make their second patient visit and introduce the patient to the "Avonex pen," which contained a full dose.

patient at whatever frequency they wished.

153.    The training CEs provided consisted of services such as explaining the disease type to the patient, helping overcome needle-phobia, and the proper use and administration of Biogen's medications.  In addition, CEs were also available at almost any time to answer any questions the patient might have about MS or their medications and assist with obtaining refills.  Also included was training to help the patient stay compliant with administering their medication.  The services just mentioned were of great value to providers. According to CW4, in the absence of Defendants' CEs, a provider's staff would have to devout time and resources to provide the aforementioned training and answer patients' questions.  However, through Defendants' provision of the CEs' services, providers could unload some of their office's burden in training and dealing with patients onto Biogen, thereby freeing up resources.

154.    Following patient training, CEs would prepare an injection report to review with the physician.[35] This report was a means to gain additional access to the provider by coming back to the office, again, to discuss a patient specific response to therapy.

155.    The training typically lasted one-to-two hours.  According to CW2, this was a huge benefit to providers because "doctors don't have that kind of time."  Moreover, these services also allow providers to pass patient questions onto CEs and, according to CW4, were happy they were not getting calls from patients with questions or complaints.

156.    After the training, the CE would report back to the prescribing physician via phone or fax. Additional training was also available if the patient requested. Sometimes these took the

---

[35]    In conjunction with these trainings, CW3 and the other CEs would prepare what was called an "injection report" which is similar to a typical nurse's report following the provision of a medical intervention. The report would have demographic as well as health information concerning how the patient tolerated the injection. CEs would also note patient concerns regarding affordability, and would report such issues to Biogen reimbursement specialists.

form of "adherence visits" which were provided if the patient was having issues with the medication. According to CW4, the number of patient visits a CE can make is unlimited, but on average, each patient received approximately three visits. Moreover, CEs will occasionally go back to a provider if a Biogen sales representative requests their assistance.

157.    Defendants also offered telephonic CE training services to prescribers' patients to induce prescriptions. The telephonic services were meant to supplement CEs' in-person patient services, so there would always be a CE available for providers' patients. These services were direct "CE to patient" MS education, and patients could access the CEs through a 1-800 number. As with the in-person CE services, these patient education services were designed to teach and help manage a providers' MS patients. Furthermore, the CEs would follow up with patients after the initial training to see if they needed their medication refilled, if a refill had not been ordered, in an effort to promote adherence, which, by no coincidence, benefits Biogen.

158.    Significantly, the value propositions to potential prescribers offered by Biogen's sales representatives and CEs occurred pre-prescription to induce that provider to write the Biogen product.[36]

159.    The CEs provided by Defendants helped Biogen secure new and refill prescriptions. Aside from the financial incentive given to providers by Defendants' CEs, through Biogen's "education" program, CEs were placed in a better position to secure more prescriptions for the

---

[36]    CW3 further states that part of her job was to "flip" patients who refused training, meaning talk them into accepting training in order to maximize adherence. Indeed, CW3 is of the position that although she was not directly responsible for initial sales, she was responsible for patient education in terms of adherence - that is, prescription renewals. She further stated that pharmaceutical sales representatives' and CEs' interests are aligned due to the fact that adherence to medication protocol means more prescriptions, and therefore means more dollars. CW3 states that she would be very clear to providers that she was a resource for them and the patient to, among other things, maintain adherence on the drug.

Covered Drugs. In other words, after the providers witnessed the benefits provided by the CEs – training, increased adherence, refills, freeing up the provider's resources – they would not only continue the patient on Biogen's medication, but would also switch MS patients prescribed to a competitor's drug to a Biogen drug in order to obtain gain the same benefits for that patient.

160.    The patient educational services offered by Defendants resulted in a large increase in prescriptions for the Covered Drugs.   According to CWs, *Biogen pharmaceutical sales representatives and the Vendor Defendants' CEs offered to "off load" providers' MS patients to the CEs to manage.*   For example, CW3 states that providers who agreed to start patients on Avonex were offered the services of a nurse to work directly with the patient. According to CW3, the value proposition offered by Defendants was received very favorably as office staff are often exhausted and under a high level of stress with little time to do case management following an injection.

**H.**     **Scheme Three: Free RS Services in Exchange for Prescriptions**

**1.   Background Information Regarding RS Services**

161.    The witnesses revealed that Biogen hired and trained dozens of skilled workers to provide free RS services for the Covered Drugs.  The RS services Defendants provided included insurance benefit verification services, prior authorization ("PA") services and coverage appeals. Biogen's sales representatives marketed these services each time they pitched a Covered Drug to a potential prescriber in order to increase the likelihood that they would prescribe Biogen drugs. Put simply, in exchange for prescribing Biogen drugs, Biogen would assume providers' administrative costs associated with starting a patient on a Biogen drug. The more a provider prescribed Biogen Drugs, as a percentage of its overall prescription volume, the greater the savings to the practice and thus profit, as time and money spent on reimbursement issues would fall on

Biogen. In this way, and as discussed in more detail below, Biogen's RS services were the "carrot" (*i.e.*, remuneration) dangled to induce providers to prescribe Biogen drugs to its MS patients.

162.    The OIG has addressed RS services in the context of the AKS in its Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 ("CPG"). The CPG, even by OIG standards, is a particularly comprehensive and detailed document covering a myriad of transactional scenarios in the pharmaceutical industry.   Given its depth and complexity, a brief outline of the CPG's structure follows.

163.    In Section II (B)(2)(b), " Kickbacks and Other Illegal Remuneration," the OIG analyzes the AKS and the "constraints it places on the marketing and promotion of [drugs] reimbursable by the federal health care programs."   For ease of illustration, CPG Section II (B)(2)(b) will be referred to as the "AKS section." In subsection B of the AKS section, the OIG identifies "Key Areas of Potential Risk" of AKS scrutiny.   This subsection will be referred to as the "Potential Risk section."   Within the Potential Risk section, the OIG analyzes the potential risks involved with two separate groups of "relationship" partners, each of whom transact business with the pharmaceutical industry.

164.    The first group is "Purchasers and their Agents" which are transactional partners that purchase drugs from the pharmaceutical manufacturers.   This group includes hospitals, nursing homes, pharmacies, "some physicians" and indirect purchasers (*e.g.*, health plans). Importantly, the term "some physicians" in this section, refers to providers who prescribe Part B (*i.e.*, "buy and bill" drugs).   Unlike the providers in this matter who prescribe Part D drugs (*e.g.*, the Covered Drugs and other MS drugs), these providers purchase drugs directly and administer them to patients and bill both for the drugs and their administration.  The reason for permitting RS services for "buy and bill" providers and other purchasers is that this group must make an initial

financial investment in acquiring the drug. In certain circumstances, this group would be reluctant to make this initial financial investment because of the fear that it would not be able to recoup the outlay in the reimbursement process. Thus, the OIG, while acknowledging the risk associated with services such as RS, struck a balance between that risk and the financial risks of purchasers and permitted the provision of limited support services that had no independent value to "buy and bill" providers and other purchasers. Here, if Biogen was offering limited RS services to "buy and bill" providers, the conduct would likely face less scrutiny by the OIG.

165.    However, as is detailed below, Biogen is offering RS services to Part D providers, not "buy and bill" providers. The OIG addressed these providers in a separate subsection of the CPG's Risk section. This group is analyzed in the section entitled "Physicians and Other Persons and Entities in a Position to Make or Influence Referrals." This group is comprised of "persons or entities in a position to refer, order, or prescribe—or influence the referral, ordering, or prescribing of—the manufacturers' [drugs]." Here, this group includes medical providers who "recommend" (*i.e.*, prescribe) Biogen Drugs. Unlike Part B providers, for Part D providers, OIG chose not to permit RS services. Rather OIG urged particularly close scrutiny stating, in relevant part:

> Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturer's product, the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals. For example, if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (*i.e.*, have independent value to the physician), or if items or services are sold to a physician at less than their fair market value, the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer. *Id.*

166.    The OIG's CPG guidance is similarly reflected in the Pharmaceutical Research and Manufacturers of America (PhRMA) Code on Interactions with Healthcare Professionals ("PhRMA Code") which specifically prohibits subsidizing and/or supporting RS services for Part

D providers.  Specifically, Section 13 of the PhRMA Code, entitled "Independence and Decision

Making," states:

> No . . . subsidies, support, . . . or educational or practice related items should be provided
> or offered to a healthcare professional in exchange for prescribing products or for a
> commitment to continue prescribing products. Nothing should be offered or provided in a
> manner or on conditions that would interfere with the independence of a healthcare
> professional's prescribing practices.

167.    Thus, while pharmaceutical manufacturers have some limited leeway in their

relationships with purchasers, they do not have the same leeway in their relationships with those

who can "recommend" prescription drugs.  However, as discussed herein, what little daylight may

have been given to Biogen soon vanished as Biogen began to give tangible benefits to providers

in order to induce recommendations of Biogen Drugs.

168.    This value proposition was a powerful tool in the hands of Biogen's sales

representatives and was used to influence providers to recommend Biogen Drugs.  Biogen's sales

representatives could offer providers an "on call" reimbursement support team to manage their

patients' Biogen prescriptions.  RS services became very much a part of the Biogen sales

representatives' collective sales pitch.  That is, rather than promoting and marketing its drugs on

patient outcomes and efficacy, Biogen introduced an additional incentive to providers to

recommend its drugs to patients: free RS services.  Biogen knew that these services would present

a tangible value to the providers.  When that offer was accepted, the provider received the benefits

of the RS services for free.  Most importantly, these services resulted in greater profit from each

provider's E/M reimbursement.  It was in this fashion, giving a provider free RS services, that

Biogen "eliminate[d] an expense that [the provider] would have otherwise incurred" because in

the absence of Biogen's provision of such services the provider would have to perform these tasks

associated with the Biogen drug prescription.  Indeed, and as discussed below, if Biogen did not

provide these services, providers would have to dedicate resources or pay a third-party, per patient, to complete the administrative tasks associated with prescribing Biogen's drugs. Such "in kind" remuneration, given to induce a recommendation for a Biogen Drug, is an unlawful kickback under the AKS.

169.    Further, the PA process is particularly cumbersome and widely reviled by providers. Biogen's RS services eliminates most of this burden. And, as stated above, providers are not permitted to charge a fee to patients for obtaining a PA because the payer-provider contracts with Medicare, Medicaid and private insurance prohibit charging a fee for this service. Thus, Defendants' provision of RS services allows providers to collect greater reimbursement than is warranted because, although Biogen is performing these services, payments for these services are bundled within the Medicare reimbursement for E/M services.

170.    Biogen's sales representatives aggressively pitched its RS services to providers. Biogen sales representatives made clear that these services would provide a valuable "in kind" benefit to providers by saving a provider time and money, resulting in greater profit for the provider. Such "in kind" remuneration given to induce a recommendation for a Biogen Drug is an unlawful kickback under the AKS.

### 2.   RS Services and Coverage Determination Services are Tangible Benefits to Providers

171.    Generally, coverage determination and other reimbursement support services provide a great value to providers because these services reduce, and in some instances eliminate entirely a provider's administrative costs that are associated with prescribing drugs. These services also help increase a provider's overall profitability, especially "office-based" MS providers. This is due to the fact that MS office-based providers derive most of their revenue from billing for 15, 30, and 45-minute office visits provided to MS patients. Such office visits are typically referred

65

to as "evaluation-and-management services" or "E/M" for short. In 2012, the most commonly billed service to Medicare by physicians was the $70 "doctor office visit" for a 15-minute consultation, closely followed by the $100 "doctor office visit" for a 30-minute consultation. Medicare pays over $11 billion each year for E/M services alone. Medicaid and private insurers also pay many more billions annually.

172.    Part of the Medicare payment for E/M services is intended to compensate the provider not only for the actual medical care given to a patient, but also for administrative tasks associated with that patient's care. For example, if a provider receives $50 for an E/M service provided, a portion of that $50 is intended to compensate the provider for the administrative tasks inherent in managing that patient's care.   Such administrative tasks include the RS services provided by Defendants.

173.    Whenever a patient is prescribed an MS drug following an office visit, the provider must attend to the inherent administrative responsibilities associated with that prescription.  These tasks include: (a) determining the patient's prescription drug insurance benefit verifications ("BV"); (b) determining if the drug is on formulary lists and tiers; (c) seeking a coverage determinations; (d) determining co-pays and deductibles; (e) telephone calls to patients; (f) responding to patient complaints; (g) returning messages and faxes;(h) handling prescription refill requests; and, where necessary (i) obtaining "prior authorizations."  These tasks are in addition to managing the resultant paper trail.   For years, industry research has demonstrated the enormous administrative costs incurred by providers when prescribing.   To ensure providers do not bear the full burden, a portion of each provider's E/M Medicare reimbursement is intended to compensate for the administrative services associated with prescribing and managing patients' medications.

174.    Importantly, pursuant to the payer-physician contract, MS office-based providers

66

are prohibited from directly charging patients a fee for writing prescriptions, verifying a patient's drug prescription benefit and/or obtaining any prior authorization for the medication. Instead, MS providers are reimbursed for these services indirectly through the E/M unit charge.

175.    Since an MS provider's E/M reimbursement for each office visit is fixed per unit, providers are continuously seeking ways to combat overhead costs and expenses in order maximize the profit derived from each E/M visit billed. One way to do so is by reducing the administrative costs associated with prescribing MS drugs. If a provider can reduce this administrative cost, each E/M unit will be more profitable.

176.    The economics just described have a direct impact on a providers' prescribing behavior. That is, providers are less likely to prescribe a drug that imposes an undue burden on office staff, as those tasks would result in a decrease in profit resulting from the need to hire more staff or see fewer patients throughout their day. Conversely, a provider is much more likely to prescribe drugs that carry little or no administrative burden. Thus, the provider's relative cost and burden in prescribing one company's medication when compared to another company's medication directly influences which drug a provider will recommend to a patient.

177.    These economic truisms certainly are not lost on pharmaceutical manufacturers like Biogen. As such, over the last 10 years, Biogen developed a concierge of Biogen drug coverage determination and RS services that are marketed to providers along with Biogen drugs in order to induce providers to recommend Biogen drugs. While these services cost millions of dollars to provide, Biogen readily incurred this expense, knowing that these services would act as a powerful inducement to providers to recommend Biogen drugs over a competitor's drugs.

### 3.  Biogen Drug Support Services are a Tangible Value to Providers

178.    The Covered Drugs cost approximately $60,000 per year. For most, if not all

patients, unless the medication is covered by his/her insurance, the patient cannot afford Biogen drug therapy. Thus, the first step requires a determination of the amount of prescription drug coverage that a patient may have for the drug. This step is called a BV. For most office-based MS providers, a patient's BV is performed by the office staff. The witnesses state completing a BV can take over an hour, and includes multiple calls just to determine the nature and extent of the patient's coverage. However, if the provider recommends the Covered Drugs, Biogen alleviates this burden on the provider and has its staff perform the BV.

179. Each day, Biogen's Rockland, MA office receives electronic and fax prescription requests from providers. Each request is immediately forwarded to the BV specialist who will perform the BV process for the provider. First, a BV specialist verifies the patient's primary and secondary insurance benefits (*i.e.*, private insurance, Medicare, Tricare, and/or Medicaid). Next, the BV specialist contacts the patient's health insurance carrier and verifies the nature and extent of the patient's prescription drug coverage. In cases of Medicare and Medicaid, this is called a "coverage determination." For Medicare patients prescribed to the Covered Drugs, coverage determinations are particularly cumbersome and time consuming because many Part D plans have four complex coverage phases: (1) Deductible phase – where a patient pays 100% for drug costs until the deductible amount is met; (2) Initial coverage limit phase – where a patient pays a percentage of the cost depending on the carrier and the drug's formulary position; (3) Coverage gap, or "donut hole" phase – where patients pay 45% of the cost for brand-name drugs and 65% of the cost for generic drugs in 2015; and, (4) catastrophic coverage phase – where a patient pays either 5% of the covered drug cost or $2.65 for generics and $6.60 for brand name drugs in 2015.

180. The witnesses state that nearly all MS providers who prescribe the Covered Drugs, also accept Biogen's offer to perform the BV and/or coverage determination. The witnesses

further state that these services have tangible value, particularly given the time required to verify benefits for expensive drugs like the Covered Drugs. Absent this BV service, providers would be required use his/her own staff and resources to help patients through the BV and coverage determination process. Alternatively, if the provider chose to outsource this service, providers would be forced to contract with a private vendor and pay a transactional fee each time a patient's benefits were verified. This fee ranges from $50 to $80 per benefit verification. Instead, Biogen's sales representatives offer providers a means to "outsource" this function without any direct or indirect cost to the provider – but only if the provider prescribes a Biogen drug.

181.    Biogen also offers providers PA services. A PA is a requirement by an insurance carrier that a patient's provider obtain approval from the patient's health insurance plan before prescribing certain medications. Further, if a medication receives a PA, that authorization may only be valid for a limited time, such as for one year, and sometimes for only a month. After that, the provider must start the PA process over again. This service is particularly important to providers prescribing high cost drugs, like those at issue here, which nearly always require a PA from the patient's insurance carrier. The PA process is particularly cumbersome and is widely reviled by MS providers. The paperwork and time required for a PA may, in many cases, result in a provider choosing to write a cheaper competitor medication that does not require a PA. Part D carriers use the PA process in order to contain costs associated with expensive medications. That is, if a MS provider wants to recommend an expensive drug like those, here, the Part D carrier will require that provider to take the time and effort to "make the case" for prescribing the drug over a cheaper drug.

182.    Further, if a patient's insurance carrier denies coverage or the PA request, Biogen also provides physicians with a service to appeal that adverse determination and ultimately achieve

a reversal of the adverse determination.

183.    PAs and appeals always require direct input from the provider regarding the patient's medical necessity for a particular drug and specialized knowledge from the provider's staff about each carrier's unique PA criteria. A PA takes time and experienced personnel to complete. PA assistance can range from analysis of the comprehensive PA criteria for a particular patient to assistance with a form letter for the provider to submit to the carrier.   Further, the language in each PA must be tailored to each patient's carrier and in some way relate to the patient's medical condition and need for the drug.   Importantly, providers are not permitted to charge a fee to patients for obtaining a PA because the payer-provider contracts with Medicare, Medicaid, and private insurances prohibit charging a fee for this service. This prohibition makes sense because, as discussed above, payment for these services are bundled into the reimbursement providers receive for providing E/M services.

184.    However, over the last 10 years, Biogen trained personnel handled nearly all prior authorizations and appeals needed for prescriptions for the Covered Drugs.  Sales representatives specifically touted this service as a tangible benefit to providers who chose Biogen drugs over competitors.  Absent Biogen's PA services, a provider would be required to hire staff with PA and appeal expertise and spend time and money helping patients through this process. Alternatively, if the provider chose to outsource this service, he/she would be forced to independently contract with a vendor and pay a transactional fee each time a patient needed this service. This fee ranges from $80 to $100 per service. Instead, Biogen sales representatives offer providers a means to "outsource" the PA responsibilities without any cost to the provider – but only if the provider prescribes a Biogen drug.

### 4. Biogen Routinely Violates Other Medicare Rules when Engaged in this Conduct

185.    While carrying out the unlawful scheme just discussed, Biogen not only violates the AKS but also the Medicare regulations regarding patient privacy and duty of care requirements when performing its RS services. Witnesses state that when calling a patient's prescription benefit plan, Biogen representatives willfully misrepresent themselves as the patient's "appointed representative" or as "calling from the doctor's office." This ruse allows Biogen to circumvent Medicare rules regarding the reimbursement and appeal process. Broadly speaking, Medicare gives patients the right to prompt coverage determinations, the right to seek reconsideration of an adverse coverage determination, and the right to appeal any adverse coverage determinations. This right is afforded to all Medicare beneficiaries seeking prescription coverage for drugs, including MS patients who have been prescribed Biogen Drugs. For Biogen Drugs, the coverage determination requires contacting the patient's Part D carrier and conveying information about the patient and the need for the medication. Because of privacy and HIPAA concerns, Medicare rules only permits three parties to seek a coverage determination: 1) the patient; 2) the prescribing physician; and 3) the patient's appointed representative. It goes without saying that Biogen is neither the patient nor the prescribing physician. Further, Biogen is also not the patient's "appointed representative."

186.    Medicare regulations define "appointed representative" as follows:

Appointed representative means an individual either appointed by an enrollee or authorized under State or other applicable law to act on behalf of the enrollee in filing a grievance, obtaining a coverage determination, or in dealing with any of the levels of the appeals process. Unless otherwise stated in this subpart, the appointed representative has all of the rights and responsibilities of an enrollee in filing a grievance, obtaining a coverage determination, or in dealing with any of the levels of the appeals process, subject to the rules described in part 422, subpart M of this chapter.

42 C.F.R. § 423.560.

187.    A patient's appointed representatives traditionally include relatives, friends, advocates, attorneys, physicians, or an employee of a pharmacy, charity, state pharmaceutical assistance program, or other secondary payor.  In addition, there are stringent rules regarding the form and manner in which this appointment can be made.  Biogen follows none of these rules; therefore it is not permitted to claim to be the patient's representative.  Thus, since Biogen is not the patient, the prescribing physician, nor the patient's appointed representative, it is without any legal authority to engage in the RS services it uses to induce MS prescribers to recommend Biogen Drugs to patients over competing MS drugs.    Such conduct raises significant privacy and patient care concerns.

## CONCLUSION

188.    As discussed herein, Defendants, through the foregoing conduct, violated the AKS and FCA by providing unlawful remuneration to secure prescriptions. First, Biogen designed, implemented, and managed an unlawful "white coat marketing" scheme in its purest form, paying tens of millions of dollars to the Vendor Defendants' clinicians to recommend the Covered Drugs to both providers and patients, while masquerading as "educators."   Second, Biogen and the Vendor Defendants provided and continue to provide prescribers of the Covered Drugs with free CE services in order to induce those providers to recommend and prescribe the Covered Drugs to their patients.  This is a "*quid pro quo*" in its truest fashion.  Third, Defendants provided and continue to provide free RS services to providers who prescribe the Covered Drugs.

189.    Reimbursements for these drugs were issued by federal health care programs, including Medicare and Medicaid, and therefore were issued in violation of, *inter alia*, the AKS and the FCA. Furthermore, the costs to provide CE services and RS services are reflected in the

cost of the Covered Drugs. As a result of Defendants' misconduct, the government has been defrauded and suffered a substantial loss.

## COUNT I
### (False Claims Act, 31 U.S.C. § 3729 *et seq.*)

190.    Relator repeats each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

191.    As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare, Medicaid, and TriCare by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks provided to referring physicians.

192.    By virtue of the acts described above, Defendants have violated:

(1)    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)    31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

193.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator realleges that Defendants knowingly violated 31 U.S.C. §§ 3729(a)(1)-(2) and (a)(7) prior to amendment, by engaging in the above-described conduct.

194.    By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II
### (California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)

195.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

196.    This is a *qui tam* action brought by Relator on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

197.    Cal. Gov't Code § 12651(a) provides liability for any person who:

   (1)    knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

   (2)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

   (3)    conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

   (4)    is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

198.    Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded health care programs.

199.    The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' conduct, paid the claims submitted by health care providers and third party payers in connection therewith.

200.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid

74

and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes was also a condition of payment of claims submitted to the State of California.

201.    Had the State of California known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

202.    As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

203.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of itself and the State of California.

204.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CALIFORNIA:

    (1) Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

    (2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;