UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* SMSF, LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>BIOGEN, INC., INVENTIV HEALTH, INC., and ASHFIELD HEALTHCARE, LLC,<br><br>        Defendants. | No. 1:16-cv-11379-IT |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES'
MOTION TO DISMISS**

The United States moves to dismiss all claims brought on behalf of the United States by SMSF, LLC under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), pursuant to 31 U.S.C. § 3730(c)(2)(A).[1] As discussed further below, the FCA authorizes the government to dismiss *qui tam* cases brought in its name. In this case, ample justification supports dismissal. The relator, a corporate entity created by an investment group that exists solely to file *qui tam* actions, has no inside knowledge of the pharmaceutical industry and has brought sweeping allegations against the defendants based on information that it obtained – often under false pretenses – from paid third-party witnesses. Relator has not provided, nor has the government's thorough investigation found, sufficient support for the relator's factual allegations. Lacking

---

[1] Relators have brought claims on behalf of certain Medicaid-participating states under their respective state false claim statutes. Undersigned counsel does not represent the named state plaintiffs; however, Kerry Muldowney Ascher, counsel for the state of Texas and representative of the National Association of Medicaid Fraud Control Units, has represented to the United States that all named state plaintiffs consent to the United States' motion to dismiss so long as it is without prejudice to the states, with the exception of New Jersey, which takes no position on the motion.

1

credible personal knowledge concerning its allegations, this relator should not be permitted to go forward with an action that not only would burden the defendants and the Court, but also would burden the government, which would have to utilize considerable resources to monitor the case and to respond to requests for discovery.

## I. BACKGROUND AND PROCEDURAL HISTORY

Relator, SMSF, LLC ("SMSF"), is a limited liability corporation created by Venari Partners, LLC, dba National Health Care Analysis Group ("NHCA Group"), a limited liability corporation that is itself comprised of member limited liability companies formed by investors and former Wall Street investment bankers. *See* accompanying Declaration of Brian J. McCabe ("McCabe Dec."), ¶¶ 2-3 and Exhibit A (email from attorney Marc Mukasey, counsel for NHCA Group, describing corporate structure of NCHA Group); and Exhibit B (visual aid depicting NHCA Group relators and corporate organization ). NHCA Group formed SMSF "to investigate and prosecute" this *qui tam* case. *See* First Amended Complaint, Dkt 41, ¶17.

Including the instant matter, NHCA Group, acting through numerous other limited liability companies, has filed 11 *qui tam* complaints against a total of 38 different pharmaceutical company and commercial outsourcing vendor defendants over the last two years. *See United States ex rel. SAPF, LLC, et al. v. Amgen, Inc., et al.,* No. 16-cv-5203 (E.D. Pa.); *United States ex rel. SMSPF, LLC v. EMD Serono, Inc., et al.,* No. 16-cv-5594 (E.D. Pa.); *United States ex rel. NHCA-TEV, LLC v. Teva Pharmaceuticals, et al.*, No. 17-cv-2040 (E.D. Pa.); *United States ex rel. SCEF, LLC* v. Astra Zeneca PLC, et al., No. 17-cv-1328 (W.D. Wash.); *United States ex rel. Miller, et al. v. AbbVie, Inc.*, No. 3:16-cv-2111 (N.D. Tex.); *United States ex rel. Carle, et al. v. Otsuka Holdings Co., et al.*, No. 17-cv-966 (N.D. Ill.); *United States ex rel. CIMZNHCA LLC v. CB, Inc., et al.*, No. 3:17-cv-00765 (S.D. Ill.); *United States ex rel. Health Choice Group, LLC.*

*v. Bayer Corp., et al.*, No. 5:17-cv-126 (E.D. Tex.); *United States ex rel. Health Choice Alliance, LLC v. Eli Lilly & Co., et al.*, No. 5:17-cv-123 (E.D. Tex.); *United States ex rel. Health Choice Advocates, LLC v. Gilead, et al.*, No. 5:17-cv-121 (E.D. Tex.). Each case makes essentially the same allegation: that the defendant pharmaceutical company and its commercial outsourcing vendor(s) violated the False Claims Act and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), by engaging in "white coat marketing" (*i.e.*, hiring independent contractor nurses to act as "undercover" sales representatives and engage in impermissible promotional activity), and by providing free "nurse services" and "reimbursement support services" to physicians that prescribe the company's drugs. *See, e.g.*, First Amended Complaint, Dkt 41, ¶¶ 5-7.

Shortly before SMSF filed this action in Massachusetts, John Mininno, the managing agent for NHCA Group, spoke to the media about NHCA Group's business model. *See* J.C. Herz, *Medicare Scammers Steal $60 Billion a Year. This Man is Hunting Them.*, Wired, Mar. 7, 2016, *available at* https://www.wired.com/2016/03/john-mininno-medicare/ (last visited Nov. 30, 2018). Mr. Mininno, described in the article as a "big-data entrepreneur," explained that when the Centers for Medicare and Medicaid Services ("CMS") made vast amounts of Medicare claims data available to the public, he viewed it as "a massive business opportunity," specifically with regard to *qui tam* suits. *Id.* He established NHCA Group with the backing of a "Wall Street angel investor." *Id.*

In order to obtain information for the *qui tam* suits, NHCA Group utilized a database of resumes, "scraped and extracted from publicly-available sources," which the organization used to identify "potential informants." *Id.* It then contacted these individuals under the guise of conducting a "qualitative research study" of the pharmaceutical industry, offering to pay each witness to participate in a standardized interview session. *See* McCabe Dec., ¶5 and Exhibits C-

1 – C-3 (exemplar interview transcript excerpts).   NHCA Group used this information obtained under false pretenses to prepare *qui tam* complaints, including the one it filed here.  *See, e.g.,* Dkt 41, at ¶¶ 110, 121-22, 124-26, 144 n. 22, (citing information obtained during the purported pharmaceutical industry "research study").

When it conducted its interviews, NHCA Group did not disclose to interviewees that their answers and/or documents would be utilized to support lawsuits brought against their current or former employers.  *See* McCabe Dec., Exhibits C-1 – C-3.  Likewise, on its website, NHCA Group made no mention of paying "study" participants for information to be used in litigation, instead holding itself out as a "healthcare research company that engages in qualitative research of pharmaceutical and other healthcare-related industries."  National Healthcare Analysis Group, http://www.nhcagroup.com (last visited Nov. 30, 2018).  Moreover, the website stated that NHCA Group has "no particular bias one way or the other about the industry."  *Id.*[2]

With this information that it obtained under false pretenses, NHCA Group brought sweeping allegations of nationwide misconduct against 38 different defendants – allegations that, for Medicare Part D alone, implicate more than 73 million prescriptions written by hundreds of thousands of different physicians for millions of different Medicare beneficiaries.  In each case, including this one, the government expended considerable law enforcement and prosecution resources and time to investigate the allegations.  On September 6, 2017, the United States informed this Court that it declined to intervene in this matter.  *See* Dkt 13.

---

[2]   The relator's use of a fictitious "research study" in this case bears similarities to conduct which another court in this District criticized.  *See United States ex rel. Leysock v. Forest Labs., et al.*, No. 1:12-cv-11354-FDS, 2017 WL 1591833 (D. Mass. April 28, 2017) (dismissing declined *qui tam* complaint after concluding that relator's use of a fictitious "research study" to obtain information from witnesses under false pretenses violated rules of professional conduct).

## II.   ARGUMENT

The United States respectfully requests that this case be dismissed pursuant to 31 U.S.C. § 3730(c)(2)(A). A circuit split exists concerning the government's authority under this provision. *Compare Swift v. United States,* 318 F.3d 250, 252 (D.C. Cir. 2003) (holding that the United States has an "unfettered right" to dismiss a *qui tam* action) *with United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) (holding that the United States must identify a "valid government purpose" that is rationally related to dismissal). The government respectfully suggests that the more recent *Swift* standard better comports with the FCA's statutory text and framework, in addition to the well-established deference to the government's exercise of prosecutorial discretion. Even if the government must provide a rational basis for dismissal, however, such a basis exists here for the reasons discussed below.

### A.   The FCA Statutory Framework

The *qui tam* provisions of the FCA enable the United States to recover damages suffered as a result of fraud or false claims, through the assistance of relators, who file suit "for the person and for the United States Government." 31 U.S.C. § 3730(b). The relator must file a complaint under seal and serve it, along with a written disclosure of evidence, on the United States. *Id.* at §§ 3730(b)(1) and (2). The United States has 60 days (plus any extensions granted by the court) to investigate the allegations and elect whether or not to intervene in the litigation. *Id.* at §§ 3730(b)(2) and (3). If the United States intervenes in the case, "the action shall be conducted by the Government," which will assume "the primary responsibility for prosecuting the action." *Id.* at §§ 3730(b)(4)(A) and (c)(1).

If the United States declines to intervene in the case, the relator has the right to proceed with the action. *Id.* at § 3730(c)(3). That right, however, is not absolute; rather, it is circumscribed by a number of limitations designed to ensure that the United States retains ultimate control over the action which has been brought on its behalf. For example, the court may "permit the Government to intervene at a later date upon a showing of good cause," *id.* at § 3730(c)(3), and the relator cannot dismiss the action without the written consent of the Attorney General. *Id.* at § 3730(b)(1). Most pertinent here, the FCA also authorizes the Attorney General to dismiss a *qui tam* action over a relator's objection:

> The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

*Id.* at § 3730(c)(2)(A). The United States may exercise this authority to dismiss even where it has opted not to intervene. *See United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 753 n.10 (9th Cir. 1993) (citing *Juliano v. Federal Asset Disposition Ass'n*, 736 F. Supp. 348 (D.D.C. 1990)).

B.     **Legal Standard For Dismissal Under 31 U.S.C. § 3730(c)(2)(A).**

The First Circuit has not construed section 3730(c)(2)(A), and, as noted above, a split exists among other circuits on the standard to apply when the government seeks to dismiss a *qui tam* case over the objection of the relator. In *Swift*, the Court of Appeals for the District of Columbia Circuit interpreted section 3730(c)(2)(A) to grant the Government "an unfettered right to dismiss" a *qui tam* action. 318 F.3d at 252. By contrast, in *Sequoia Orange*, the Ninth Circuit applied a "rational relation test" for dismissal, recognizing that the United States has broad prosecutorial discretion to dismiss even meritorious *qui tam* cases so long as the reasons for dismissal are rationally related to a legitimate government interest. 151 F.3d at 1145. *See*

*Ridenour v. Kaiser-Hill Co., L.L.C.*, 397 F.3d 925, 937 (10th Cir. 2005) (observing that "'it is enough that there are plausible, or arguable, reasons supporting the agency decision [to move for dismissal]'") (quoting *United States ex rel. Sequoia Orange Co. v. Sunland Packing House Co.*, 912 F. Supp. 1325, 1341 (E.D. Cal. 1995)).

Although the First Circuit has not yet adopted a standard for dismissal under section 3730(c)(2)(A), in *United States ex rel. Nasuti v. Savage Farms, Inc.*, No. 12-30121-GAO, 2014 WL 1327015 (D. Mass. Mar. 27, 2014), a court in this District expressed support for the *Swift* standard when granting the United States' motion to dismiss. *See id.* at *1 ("I find the *Swift* rationale more persuasive."); *aff'd on other grounds*, No. 14-1362, 2015 WL 9598315 (1st Cir. Mar. 12, 2015).

    C.    **This Court Should Dismiss Under The *Swift* Standard.**

The government contends that prosecutorial discretion and Congressional intent warrant application of the *Swift* standard to dismissals brought under section 3730(c)(2)(A). As the *Swift* court explained, the FCA operates against the backdrop of the general principle of separation of powers, in which the Executive Branch exercises control over whether to pursue litigation for the United States. *See Swift*, 318 F.3d at 252 ("[W]e cannot see how [section] 3730(c)(2)(A) gives the judiciary general oversight of the Executive's judgment in this regard," given that "'[t]he Government'—meaning the Executive Branch, not the Judicial—'may dismiss the action,' which at least suggests the absence of judicial constraint."). The *Swift* court reasoned that "[r]eading [section] 3730(c)(2)(A) to give the government an unfettered right to dismiss an action is also consistent with the Federal Rules of Civil Procedure," because Rule 41(a)(l)(i) 'permits a plaintiff to dismiss a civil action 'without order of the court'" if "the adverse party has not yet filed an answer or a motion for summary

7

judgment." *Id.* The court rejected the notion that a relator's right to a hearing, as provided in section 3730(c)(2)(A), was intended to confer authority on the court to review the government's reasons for dismissal. *Id.* at 253. Nothing in the FCA "purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States." *Id.* Instead, the *Swift* court concluded that the function of a hearing, if requested by relator, "is simply to give the relator a formal opportunity to convince the government not to end the case." *Id.*

The *Swift* court's interpretation of section 3730(c)(2)(A) makes sense especially in light of the different burden that the FCA explicitly imposes when the government seeks to settle a *qui tam* case over a relator's objections. When settling under such circumstances, section 3730(c)(2)(B) requires the government to establish, and the court to find, that a settlement is "fair, adequate and reasonable" notwithstanding the relator's objections. Section 3730(c)(2)(A), by contrast, does not require the government to explain to the court its reasons for dismissal; nor does it require the court to assess or approve the government's reasons for dismissal over the relator's objection. *Id.*

Congress accorded the Attorney General unfettered discretion to determine whether a *qui tam* case should be prosecuted because the United States is the "real party interest" under the FCA. *See Nasuti*, 2014 WL 1327015, at *5 (citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 772-74 (2000)). A *qui tam* relator has authority to sue under the FCA solely to seek recovery of injuries suffered by the United States, not by the relator. (The relator here does not assert a retaliation claim under 31 U.S.C. § 3730(h).) Because the government does not wish this case to proceed, and because SMSF does not, and cannot, claim to have suffered a cognizable injury separate from the injuries allegedly suffered by the

8

United States under the FCA, nothing warrants continuation of this *qui tam* action, and it should be dismissed.

### D. Under The *Sequoia Orange* Standard, Too, The Court Should Dismiss.

Even if the Court declines to apply the *Swift* standard, it still should dismiss under the *Sequoia Orange* standard, because the government has a reasonable basis to seek dismissal. Under *Sequoia Orange*, the United States need only (1) identify a "valid government purpose" for dismissing the case, and (2) show a "rational relation between dismissal and accomplishment of the purpose." 151 F.3d at 1145 (quotations omitted). "If the government satisfies the two-step test, the burden switches to the relator to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Id.* (quotation omitted). The *Sequoia Orange* court reasoned that, when a court considers a motion by the government to dismiss a *qui tam* case, it should "respect[] the Executive Branch's prosecutorial authority by requiring no greater justification of the dismissal motion than is mandated by the Constitution itself." *Id.* at 1146.

As the *Nasuti* court observed, "the [g]overnment's quest to dismiss an action under the *Sequoia [Orange]* standard" should not be "particularly arduous." *Nasuti*, 2014 WL 1327015, at *10. In that case, the court held that dismissal was appropriate under either *Swift* or *Sequoia Orange* because the government articulated a concern that, "were this case to continue, it would incur substantial costs in monitoring the litigation . . . , responding to discovery requests, and clarifying relator's misstatements of the law." *Id.* at *11. Both *Nasuti* and *Sequoia Orange* recognized that "litigation costs represent a valid government interest" and the government may therefore rationally seek dismissal of an action even where the allegations may have merit. *Nasuti*, 2014 WL 1327015, at *11 (citing *Sequoia Orange*, 151 F.3d at 1146). *See United States ex rel. Stovall v. Webster Univ.*, No. 3:15-cv-03530, 2018 WL 3756888, at *3 (D.S.C. Aug. 8,

2018) (granting government's motion to dismiss because "dismissal will further its interest in preserving scarce resources by avoiding the time and expense necessary to monitor this action"); *United States ex rel. Levine v. Avnet, Inc.*, No. 2:14-cv-17, 2015 WL 1499519, at *5 (E.D. Ky. Apr. 1, 2015) (same); *United States ex rel. Nicholson v. Spigelman*, No. 10-cv-3361, 2011 WL 2683161, at *2 (N.D. Ill. July 8, 2011) (same).

In this case, dismissal is appropriate because it is rationally related to the valid governmental purposes of preserving scarce government resources and protecting important policy prerogatives of the federal government's healthcare programs. Even if conduct of the sort alleged by relator could give rise to FCA liability in certain cases, this is not such a case. Based on its extensive investigation of the various complaints filed by Venari Partners LLC, including the complaints filed in the instant case, the government has concluded that the relators' allegations lack sufficient factual and legal support. The government's investigations included, among other things, the collection and review of tens of thousands documents from the defendants and third parties and interviews of numerous witnesses, including prescribing physicians. The government also has had extensive discussions with relators' counsel and has reviewed various information that they have provided. In addition, the government has consulted with subject-matter experts at the Office of Inspector General for the United States Department of Health and Human Services ("HHS-OIG") about the relators' allegations and the applicability of regulatory safe harbors and government-issued industry guidance.

If this matter were allowed to continue, the United States anticipates that it would have to spend considerable time and effort monitoring court filings, filing statements of interest, and responding to requests for substantial amounts of discovery. As noted above, relator's allegations implicate at least three government healthcare programs -- Medicaid, Medicare, and

TRICARE – and they cover a six-year period of time.  For Medicare Part D alone in this period, nearly 20,000 different physicians prescribed the Biogen drugs at issue more than 800,000 times to tens of thousands of beneficiaries.  Anticipated discovery burdens include the expense of collecting, reviewing, processing, and producing documents from among multiple federal healthcare programs, as well as voluminous prescription drug event data and patient health information for potentially thousands of beneficiaries, which, due to its sensitive nature, may require additional (and costly) screening and redaction.  Moreover, the government also likely would spend considerable time preparing numerous agency witnesses for depositions.  The government has rationally concluded based on its extensive investigation of relators' various cases that the relators' sweeping allegations lack adequate support and are unlikely to yield any recovery sufficient to justify the significant costs and burdens that the government will incur if the cases proceed and the resulting diversion of the government's limited resources away from other more meritorious matters.

In addition, the government has concluded that the specific allegations in this case conflict with important policy and enforcement prerogatives of the federal government's healthcare programs.  For instance, relators allege that the provision of educational information and instruction to patients constitutes illegal kickbacks to physicians.  But given the vast sums the government spends on the medications at issue, federal healthcare programs have a strong interest in ensuring that, after a physician has appropriately prescribed a medication, patients have access to basic product support relating to their medication, such as access to a toll-free patient-assistance line or instructions on how to properly inject or store their medication.  In another context, HHS-OIG has advised that the provision of educational materials or informational programs to patients, without more, does not constitute "remuneration."  *See* 81

Fed. Reg. 88368, 88396 (Dec. 7, 2016). These relators should not be permitted to indiscriminately advance claims on behalf of the government against an entire industry that would undermine common industry practices the federal government has determined are, in this particular case, appropriate and beneficial to federal healthcare programs and their beneficiaries.

### III. CONCLUSION

For the reasons set forth above, this Court should dismiss all claims brought on behalf of the United States by SMSF, LLC under the FCA with prejudice as to relator and without prejudice as to the United States pursuant to 31 U.S.C. § 3730(c)(2)(A).

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ANDREW E. LELLING
United States Attorney

Dated: December 17, 2018          By: */s/ Steven Sharobem*
STEVEN SHAROBEM (BBO #664583)
Assistant United States Attorney
John Joseph Moakley Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
Tel: (617) 748-3355
steven.sharobem@usdoj.gov

MICHAEL D. GRANSTON
COLIN M. HUNTLEY
MATTHEW R. FEARNSIDE
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
202-305-3941
202-307-3852 (fax)
Matthew.R.Fearnside@usdoj.gov